**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 23-309 (RC) |
| | : | |
| SHAMELL NAQUAN JOYNER, | : | Re Document Nos.:  49, 52, 53, 54, 98, |
| | | 99, 100, 101, 102, |
| Defendant. | | 103, 104, 105, 106 |
| | | 107, 108, 125 |
| | | 128, 143 |

**MEMORANDUM OPINION**

**DENYING DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE (ECF NO. 52);
GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTION TO ADMIT
EVIDENCE OF OTHER CRIMES (ECF NOS. 53, 98); DENYING DEFENDANT'S MOTION FOR
NOTICE OF INTENT TO USE RULE 404(B) EVIDENCE (ECF NO. 49); DENYING DEFENDANT'S
MOTION IN LIMINE REGARDING HIS CRIMINAL HISTORY (ECF NO. 99); GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE REGARDING PROPENSITY-BASED
ARGUMENTS (ECF NO. 100); DENYING DEFENDANT'S MOTION IN LIMINE REGARDING IN-
COURT IDENTIFICATION (ECF NOS. 54, 101); GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION IN LIMINE REGARDING TOOLMARK IDENTIFICATION (ECF NO. 102);
DENYING DEFENDANT'S MOTION TO STRIKE THE GOVERNMENT'S OPPOSITION BRIEF (ECF
NO. 128); GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE
REGARDING LAW ENFORCEMENT IDENTIFICATION (ECF NO. 103); GRANTING DEFENDANT'S
MOTION IN LIMINE REGARDING JAIL CALLS (ECF NO. 104); GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION IN LIMINE REGARDING CERTAIN PHOTOGRAPHS
(ECF NO. 105); GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE
REGARDING THE TESTIMONY OF OFFICER JERMONE MCCLINTON (ECF NO. 106); DENYING
DEFENDANT'S MOTION FOR AN EVIDENTIARY HEARING (ECF NO. 143); GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE REGARDING CERTAIN EXPERT
TESTIMONY (ECF NO. 107); DENYING DEFENDANT'S MOTION IN LIMINE REGARDING LATE-
NOTICED EXPERT TESTIMONY (ECF NO. 125); GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION IN LIMINE REGARDING DNA EVIDENCE (ECF NO. 108).**

## I. INTRODUCTION

Shamell Naquan Joyner is charged in twenty-eight counts of a Superseding Indictment

with Hobbs Act robbery, carjacking, transportation of a stolen vehicle, brandishing or discharge

of a firearm during a crime of violence, and unlawful possession of a firearm and ammunition by

a convicted felon.  *See* Superseding Indictment, ECF No. 27.  A jury trial will begin in this case

on June 29, 2026.  In this opinion, the Court addresses over a dozen pretrial motions pending

from the parties, including Mr. Joyner's motion to suppress tangible evidence, the Government's

motion to introduce evidence of other crimes under Federal Rules of Evidence 404(b) and 609,

and various motions *in limine* filed by Mr. Joyner.  The Court heard oral arguments on the

motions on June 15, 2026.  For the reasons below, the Court denies Mr. Joyner's motion to

suppress, grants in part and denies in part the Government's motion to admit evidence of other

crimes, and grants in part and denies in part Mr. Joyner's motions *in limine*.

## II.  FACTUAL BACKGROUND

In a prior opinion, the Court recently denied Mr. Joyner's motions to dismiss or sever

certain counts of the Superseding Indictment.  *See United States v. Joyner*, No. 23-cr-309, 2026

WL 1622706, at *1 (D.D.C. June 5, 2026).  The facts and procedural history of this case are set

forth in detail in that ruling.  In brief, Mr. Joyner is accused of committing ten armed robberies

("Armed Robberies 1–10") and two armed carjackings ("Armed Carjackings 1–2) in a three-

week period between April and May of 2023.  *See generally* Superseding Indictment.  As

relevant to the present motions, some of the Government's key evidence with respect to several

of the offenses appears to be CCTV footage from targeted convenience stores depicting a

masked robber. *See* Gov't's Mot. Admit Other Crimes Evid. Pursuant to Fed. R. Evid. 404(b)

and to Impeach Def. with Prior Convictions Pursuant to Fed. R. Evid. 609 ("Gov't's Mot.") at 2–

18, ECF No. 53.  The parties agree that the identity of the masked perpetrator is a central issue

for trial.  Thus, the Government proposes to offer a variety of evidence linking Mr. Joyner to the

charged offenses, including photographs of Mr. Joyner's prior possession of firearms, evidence

of Mr. Joyner wearing the same clothing as the perpetrator on other occasions, and testimony

from a firearm and toolmark expert opining that cartridge casings recovered from the scenes of

two of the robberies were fired from the same gun.  Mr. Joyner's present motions seek to exclude or limit much of this evidence.

### III.  ANALYSIS

The Court first addresses Mr. Joyner's motion to suppress tangible evidence, which it denies.  Next, the Court considers the Government's motion to introduce evidence under Federal Rules of Evidence 404(b) and 609, which the Court grants in part and denies in part.  Finally, the Court turns to Mr. Joyner's motions *in limine*, which it grants in part and denies in part.

### A.  Defendant's Motion to Suppress Tangible Evidence (ECF No. 52)

Mr. Joyner moves to suppress tangible evidence seized by law enforcement agents from inside his home, located at 413 Valley Avenue, SE, in Washington, D.C.  *See* Def.'s Mot. Suppress Tangible Evid. ("Def.'s Mot. Suppress"), ECF No. 52.  Metropolitan Police Department Detective Thomas O'Donnell applied for a warrant to search the Valley Avenue address on May 2, 2023.  *See id.* at Ex. 1 ("Search Warrant").  As the affiant in the application, Detective O'Donnell summarized the facts of Armed Carjacking 1, Armed Robbery 2, and other crimes attributed to Mr. Joyner, including eyewitness accounts, surveillance footage, and a description of the specific articles of clothing worn by Mr. Joyner during the crimes and the items he is alleged to have stolen.  *Id.* at 4–7.  Detective O'Donnell affirmed that he had probable cause to believe that evidence related to these crimes was present inside the Valley Avenue address.  *Id.* at 9.  After reviewing the application, D.C. Superior Court Judge Zoe Bush issued a search warrant on May 2, 2023.  *Id.* at 10.  Later that day, the warrant was executed.  According to the Government, "law enforcement agents seized clothing and shoes that were consistent with those worn by [Mr. Joyner] during several of the robberies as well as numerous identity and payment cards taken from employees during the course of the defendant's armed carjacking and

robbery spree." Gov't's Opp'n to Def.'s Mot. Suppress at 9–10, ECF No. 60. As set forth below, the Court finds that the search warrant at issue supports a finding of probable cause and therefore denies Mr. Joyner's motion to suppress.

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the places to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In seeking the issuance of a warrant, the government must submit "[a]n affidavit . . . provid[ing] the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). The task of the issuing magistrate is then "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. The duty of the reviewing court, meanwhile, "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (citation modified).

Although the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," Supreme Court decisions "establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *United States v. Ali*, 870 F. Supp. 2d 10, 24 (D.D.C. 2012) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)). This rule "is designed to safeguard Fourth Amendment rights generally through its deterrent effect, and therefore applies only where it results in appreciable deterrence." *Id.* Nevertheless, under the "good faith exception" set forth in *United States v.*

4

*Leon*, if "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," evidence seized pursuant to such warrant is admissible even if the warrant is subsequently invalidated. 468 U.S. 897, 920–22 (1984). "[C]ourts determine the objective reasonableness of the police's reliance on a warrant by considering 'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Ali*, 870 F. Supp. 2d at 25 (quoting *Herring*, 555 U.S. at 145). Suppression is not appropriate unless "the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (citation modified).

Mr. Joyner argues that the search warrant for the Valley Avenue address lacked probable cause because Detective O'Donnell's affidavit failed to establish a nexus between that address and Mr. Joyner's alleged criminal activity. *See* Def.'s Mot. Suppress at 5. The Court disagrees. Detective O'Donnell connected Mr. Joyner to the Valley Avenue address in two ways. First, according to Detective O'Donnell, on April 26, 2023, he and other detectives executed a search warrant on the Honda HR-V that Mr. Joyner allegedly stole during Armed Carjacking 1. Search Warrant at 8. Among other items, the detectives located a bank card in the name of Zaniyah Johnson. *Id.* A detective conducted a database query and found that Ms. Johnson had reported a domestic assault by Mr. Joyner inside the Valley Avenue address on April 7, 2023. *Id.* Second, also on April 26, 2023, Prince George's County police officers responded to a report of a stolen vehicle in the area. *Id.* As a result of this call for service, Mr. Joyner was arrested and charged with unauthorized removal of a motor vehicle and related theft.[1] *Id.* As part of being released

---

[1] The conduct for which Mr. Joyner was arrested on April 26, 2023, is not part of the Superseding Indictment.

from police custody for this arrest, Mr. Joyner provided a Prince George's County Commissioner with a home address of 413 Valley Avenue, SE.[2] *Id.* at 9.

Detective O'Donnell also sufficiently connected Mr. Joyner's residence to his alleged criminal activity. "[P]robable cause requires not only a fair probability of criminal activity but also a nexus between that activity and the place to be searched." *United States v. Savoy*, 889 F. Supp. 2d 78, 88 (D.D.C. 2012). In this case, no criminal activity was directly observed in the vicinity of the Valley Avenue address. Nevertheless, as the D.C. Circuit explained in *United States v. Thomas*, "observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house . . . if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." 989 F.2d 1252, 1254–55 (D.C. Cir. 1993). The Court agrees with the Government here that the facts presented in Detective O'Donnell's affidavit would "warrant a man of reasonable caution" to believe that evidence of the crimes described therein would be found at the Valley Avenue address. *Texas v. Brown*, 460 U.S. 730, 742 (1983); Gov't's Opp'n to Def.'s Mot. Suppress at 17–18.

First, Detective O'Donnell described the clothing worn by Mr. Joyner during the alleged offenses. Search Warrant at 2–9. In *Thomas*, the D.C. Circuit found that there was probable cause to search a defendant's residence for business records and the clothing that the defendant wore when he sold cocaine to an undercover officer, even though the affiant officer's affidavit in support of the search warrant for the defendant's house "offered no facts indicating that criminal

---

[2] Mr. Joyner faults Detective O'Donnell for not performing an investigation to confirm that Mr. Joyner in fact lived at the Valley Avenue address. Def.'s Mot. Suppress at 6. However, the Court agrees with the Government that an independent investigation was not necessary given that Mr. Joyner himself provided that address as his residence to a Prince George's County Commissioner mere days before the search warrant at issue was executed.

activity occurred at the house." 989 F.2d at 1253–54. Like in *Thomas*, it was reasonable here for Judge Bush to conclude, based on Detective O'Donnell's description of the specific articles of clothing worn by Mr. Joyner during the alleged offenses, that some of these articles would be found in Mr. Joyner's residence.

Second, Detective O'Donnell described the items allegedly stolen by Mr. Joyner, including specific quantities of cash, cigarettes, a cell phone, a wallet, and a credit card belonging to one of the victims. Search Warrant at 2–9. In *United States v. Feliz*, the First Circuit found that the facts presented in the affiant officer's affidavit allowed a reasonable inference to be drawn as to the probable presence of incriminating evidence in the defendant's apartment—including money he collected from illicit drug sales and records describing such transactions—even though no drug sales were described to have occurred at the apartment. 182 F.3d 82, 87 (1st Cir. 1999). The First Circuit explained that it was reasonable to infer that the defendant had stashed drug paraphernalia in a safe and accessible place, and because no other drug-dealing headquarters of his was identified, "[i]t followed that a likely place to seek to find incriminating items would be [his] residence." *Id.* at 87–88. Here, too, it was reasonable for Judge Bush to suppose that Mr. Joyner kept the stolen items in his home.

Because the Court has found that Detective O'Donnell's affidavit amply supports a finding of probable cause, it could deny Mr. Joyner's motion to suppress on that basis alone. But even if Judge Bush had erred in finding probable cause, *Leon*'s good faith exception would also require the Court to deny Mr. Joyner's motion. In view of Detective O'Donnell's extensive and detailed summary of Mr. Joyner's alleged criminal activity in the affidavit, including the specific items Mr. Joyner is alleged to have stolen, no "reasonably well trained officer would have known that the search was illegal" based on the affidavit alone. *Ali*, 870 F. Supp. 2d at 25 (quoting

7

*Herring*, 555 U.S. at 145).  The evidence recovered during the search of Mr. Joyner's Valley Avenue residence can therefore be introduced at trial.

**B.  Government's Motion to Admit Evidence of Other Crimes (ECF Nos. 53, 98)**

In May of 2025, the Government provided Mr. Joyner notice (1) that it will seek to introduce evidence at trial of other crimes he has committed pursuant to Federal Rule of Evidence 404(b), and (2) that if he testifies at trial, it will seek to impeach him with evidence of his prior convictions pursuant to Federal Rule of Evidence 609.  *See* Gov't's Mot.  Then, a few weeks ago, the Government filed a supplement informing Mr. Joyner of its intent to admit several other categories of evidence falling under Rule 404(b).  *See* Gov't's Suppl. Mot. Admit Other Crimes Evid. Pursuant to Fed. R. Evid. 404(b) ("Gov't's Suppl. Mot."), ECF No. 98.  The Court addresses the Rule 404(b) and Rule 609 motions in turn.[3]

1.  Rule 404(b) Motion

Pursuant to Rule 404(b), the Government asks the Court to admit (1) five photographs depicting firearms or Mr. Joyner holding firearms on occasions other than the charged offenses; (2) evidence of the clothing that Mr. Joyner was wearing when he was arrested on April 26, 2023, for another offense not charged in the instant case; and (3) evidence of a contemporaneous robbery of a 7-Eleven employee and a fraudulent transaction that occurred on the employee's credit card.[4]  Gov't's Suppl. Mot. at 1.  For the reasons below, the Court denies the

---

[3] Because the Government has provided notice of its intent to use Rule 404(b) evidence at trial, the Court denies Mr. Joyner's motion for an order requiring the Government to do so.  *See* Def.'s Mot. for Notice of Gov't's Intention to Use Rule 404(b) Evid. at Trial, ECF No. 49.

[4] In its supplemental motion, the Government also provided notice of its intent to introduce evidence of all offenses currently charged in the Superseding Indictment if the Court granted Mr. Joyner's previously pending motions to dismiss or sever various offenses.  *See* Gov't's Suppl. Mot. at 18.  Because the Government has now denied Mr. Joyner's motion to dismiss and motion for severance, this issue is moot.

Government's Rule 404(b) motion with respect to the five photographs depicting Mr. Joyner's prior firearm use but grants the motion otherwise.

Under Federal Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Despite being phrased in restrictive terms, Rule 404(b) "is actually one of 'inclusion rather than exclusion.'" *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). Evidence of a defendant's other crimes is prohibited under the Rule only "if it is offered for the impermissible inference that a defendant is of bad character" and therefore prone to criminality. *Id.* But this evidence is admissible for any other purpose "so long as the evidence is not offered *solely* to prove character." *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990).

Courts undertake a two-step analysis to determine whether evidence of other crimes is admissible under Rule 404(b). The "threshold inquiry" is "whether the evidence is probative of a material issue other than character," including any of the permissible purposes listed in Rule 404(b)(2). *Id.* at 1435 (citation modified). "If offered for such a proper purpose, the evidence is then subject only to general strictures limiting admissibility, the most important of which being the requirement of Rule 403 that the probative value of the evidence not be 'substantially outweighed' by its potential prejudice." *Id.* (citation modified); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a

9

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

*a. Evidence of Prior Firearm Possession*

First, the Government seeks to introduce five photographs demonstrating that Mr. Joyner possessed firearms on occasions other than the charged offenses as "evidence that he knowingly and intentionally possessed a firearm during the incidents that form the basis of the charged conduct." Gov't's Suppl. Mot. at 3. These photos were recovered from the phone of Mr. Joyner's relative, N.L., after the two individuals were arrested for conduct charged in the instant case on May 2, 2023. *See* Gov't's Mot. at 6, 27; Hr'g Tr. at 9:11–10:7. One of the photos, dated around April 20, 2023 ("April 20 Photo"),[5] shows Mr. Joyner inside of the Honda HR-V allegedly stolen in Armed Carjacking 1, holding a firearm in his left hand and a wad of cash in his right hand. *Id.* at 6 fig. 5. *See* Gov't Ex. ("GX") 1601A. The other four photos ("Two-Tone Gun Photos") either depict Mr. Joyner holding a two-tone gun or, in one of the photos, simply a two-tone gun lying on the floor. Gov't's Suppl. Mot. at Exs. 1–4. Metadata for the Two-Tone Gun Photos suggests that these were taken in January of 2023. *See* GX-1601B–E.

The Government contends that it wishes to offer the April 20 Photo and the Two-Tone Gun Photos for two alleged non-propensity purposes: (1) as evidence that Mr. Joyner's possession of a firearm during the indicted robberies and carjackings was knowing; and (2) as evidence that he had ready access to firearms, and thus could commit these crimes. Gov't's Reply in Supp. Mot. at 1, ECF No. 63. For example, the Government explains that because "no witness will be able to testify that they saw [Mr. Joyner] in actual possession of [a] firearm"

---

[5] Although the Government represents that the photograph was taken on April 20, its associated metadata suggests that it was captured on April 19, 2023.

during Armed Robberies 1 and 3, photos of Mr. Joyner holding a firearm at other times will make this fact more likely.  Gov't's Mot. at 39.  The Government also explains that to prove that Mr. Joyner brandished or discharged a firearm during the commission of Armed Robberies 1–10 and Armed Carjackings 1–2, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) or (iii), it needs to establish that he knowingly possessed a firearm.  *See* Gov't's Reply in Supp. Mot. at 2–3; *see also United States v. Coleman*, 78 F.3d 154, 156 n.1 (5th Cir. 1996) ("In order to convict defendants of using a firearm in the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1), the government must prove: (1) that defendant *knowingly* used or carried a firearm, and (2) the use or carrying of the firearm occurred during and in relation to a crime of violence." (emphasis added)).  Accordingly, the Government contends, evidence that Mr. Joyner possessed a gun on occasions other than the indicted robberies and carjackings can help it establish the required *mens rea* element of the charged § 924(c) offenses.[6]

The Court finds, however, that photographs of Mr. Joyner's firearm possession on such other occasions are not particularly probative of his knowledge regarding his alleged firearm use during the charged offenses.  It is true, as the Government observes, that "in cases where a defendant is charged with unlawful possession of something, evidence that he possessed the same or *similar things* at other times is often quite relevant to his knowledge and intent with regard to the crime charged." *Cassell*, 292 F.3d at 793 (quoting *United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001)).  However, the Government overlooks that this principle is

---

[6] Mr. Joyner is also charged in two counts with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  *See* Superseding Indictment at 2–3, 14.  However, the Government has not indicated that it seeks to introduce evidence of Mr. Joyner's prior firearm possession to establish the *mens rea* element of the § 922(g)(1) charges.

11

generally confined to cases in which the defendant is charged with *constructive* possession.[7] *See United States v. Williams*, 620 F.3d 483, 489 (5th Cir. 2010) ("In the context of a weapon-possession case, Rule 404(b) evidence of intent is relevant to a theory of constructive possession, but not to a theory of actual possession."). "The government can prove possession by showing that a defendant exercised either direct physical control over a thing (actual possession) or 'dominion or control' over the thing itself or the area in which it was found (constructive possession)." *United States v. Jones*, 484 F.3d 783, 787 (5th Cir. 2007). Here, the Government's theory appears to be that Mr. Joyner exercised actual control over a firearm when he brandished or discharged it while committing Armed Robberies 1–10 and Armed Carjackings 1–2. *See generally* Superseding Indictment. But "[t]he D.C. Circuit has never held, as far as the Government notes or this Court is aware, that evidence of prior possession of a gun is probative of knowledge, absence of mistake, or any other non-propensity purpose to support an actual-possession theory in a gun case." *United States v. Burns*, No. 24-cr-151, 2025 WL 1078781, at *4 (D.D.C. Apr. 10, 2025).

---

[7] Indeed, although the Government is correct that courts routinely admit evidence of prior firearm possession to establish a defendant's knowing possession of a firearm, the cases it cites in support of this proposition all involved constructive possession charges. *See* Hr'g Tr. at 12:14–16 (The Court: "Okay. And do you have an actual possession case that you think applies here?" The Government: "No, Your Honor, not off the bat, not with regards to actual possession."). In *Cassel*, for example, the defendant was charged with constructive possession of firearms and ammunition found in his bedroom in his uncle's house, which the defendant claimed belonged to his uncle. 292 F.3d at 793. The D.C. Circuit affirmed the district court's decision to admit evidence of the defendant's prior gun possession to rebut this claim, finding that this evidence "was relevant to show [the defendant's] knowledge of, and intent to possess, the firearms recovered from his room." *Id.* at 792. Similarly, in *United States v. Williams*, also cited by the Government, the district court admitted images of the defendant previously holding a gun to prove knowledge and absence of mistake with respect to a firearm found inside the defendant's backpack. 507 F. Supp. 3d 181, 191 (D.D.C. 2020). The district court agreed with the prosecution that these images "ma[d]e it more likely that [the defendant] knew of the firearm in his backpack." *Id.*

Unlike for actual possession, "[i]t is settled law" in this Circuit and others that "prior firearm possession by a defendant is probative of his knowledge and intent to possess a weapon when the theory of prosecution is one of constructive possession." *United States v. Fields*, No. 18-cr-267, 2019 WL 690347, at *1 (D.D.C. Feb. 19, 2019). This is intuitive. As the Fifth Circuit has explained, "knowledge and intent are frequently at issue" in such cases, given that "[a] defendant will often deny any knowledge of a thing found in an area that is under his control (e.g., a residence, an automobile) or claim that it was placed there by accident or mistake." *Jones*, 484 F.3d at 788. This scenario offers "a classic case for introducing prior instances of gun possession, since the government would otherwise find it extremely difficult to prove that the charged possession was knowing." *United States v. Garner*, 396 F.3d 438, 443–44 (D.C. Cir. 2005) (quoting *United States v. Linares*, 367 F.3d 941, 949 (D.C. Cir. 2004)). That is, evidence of prior firearm possession can help the prosecution show that the defendant "knew of, and was in a position to exercise dominion and control over," a firearm recovered from an area under his control. *Cassell*, 292 F.3d at 792 (citation modified).

In contrast, once the prosecution establishes actual possession by showing that a "defendant had a firearm under his immediate physical control, any contention that he did not know the nature of what he possessed is effectively precluded." *Jones*, 484 F.3d at 788. And when the prosecution can make this showing, the value of Rule 404(b) evidence in proving knowledge or intent lessens significantly. The D.C. Circuit underscored this point in *United States v. Linares*. *See* 367 F.3d at 946–47. There, the evidence at trial established that Linares, while inside a car with two friends, got into an argument with a group of people standing outside of a nightclub that ended in "the firing of six shots from Linares's car, and with Linares speeding away." *Id.* at 943–44. One of the passengers in the car testified that she saw Linares shoot the

gun. *Id.* at 944.  Furthermore, police officers pursued Linares and saw him holding the gun out of the car window before throwing it over a nearby fence. *Id.*  Linares was charged with being a felon in possession of a handgun, and at trial, the district court admitted evidence of Linares's prior firearm possession to prove intent, knowledge, and absence of mistake with respect to the discarded handgun. *Id.* at 945.  The D.C. Circuit concluded this was error, however.  Amid eyewitness testimony that Linares had physically possessed the gun before throwing it out of his car window, the D.C. Circuit rejected the idea that "Linares's previous possession of a pistol ma[de] it any more likely that he knowingly possessed a gun this time." *Id.* at 946.  As the D.C. Circuit explained, "it is hard to see how Linares could possibly have possessed the gun unknowingly, i.e., without being aware that he possessed it or without realizing that the object in his hand was a gun." *Id.*

Similar to *Linares*, the Government here will present evidence that the perpetrator of the indicted robberies and carjackings *actually* used a firearm. *See, e.g.*, Gov't's Mot. at 3 fig. 1 (surveillance footage from the store targeted during Armed Robbery 1 depicting the robber holding a gun), 9 fig. 7 (same for Armed Robbery 2), 14 fig. 11 (same for Armed Robbery 4), 18 fig. 13 (same for Armed Robbery 6).  This is the case even for Armed Robberies 1 and 3. *See, e.g.*, *id.* at 2–3, 9–11 (noting that surveillance footage from Armed Robbery 1 captured the perpetrator holding a gun and that cartridge casings were recovered from the scenes of Armed Robberies 1 and 3).  If the Government can present non-Rule 404(b) evidence to the jury demonstrating that Mr. Joyner—assuming he is the perpetrator—brandished or discharged a gun during the indicted offenses, it has little need to show the jury five photographs of Mr. Joyner holding a gun on unrelated occasions to prove that his use of the gun during those offenses was knowing.  By showing the jury these photographs, the Government would effectively be inviting

14

it to draw an impermissible propensity inference—that because Mr. Joyner possessed and had ready access to guns on other occasions, he is the sort of person who is likely to have used a gun while committing the indicted robberies and carjackings.

The Government argues that *Linares* is distinguishable because here, the identity of the perpetrator of the offenses is at issue. *See* Gov't's Reply in Supp. Suppl. Mot. at 5, ECF No. 126. "Because the individual depicted in the surveillance footage is masked," the Government contends, Mr. Joyner "may argue that he is not the person depicted in the surveillance footage." *Id.* at 3. At the motions hearing, the Government thus suggested that if Mr. Joyner "can simply deny even being present, that, too, is grounds for allowing the introduction" of the photographs depicting his prior firearm use. Hr'g Tr. at 12:11–13. The Court does not follow this reasoning. Evidently, proof that Mr. Joyner has had guns in the past does not make it more likely that he is the masked robber simply because the masked robber also had a gun.[8] The photos will thus be of no use to the jury as it attempts to determine if the masked robber is, in fact, Mr. Joyner. Indeed, based on the surveillance footage—which clearly shows a masked robber wielding a gun—no reasonable jury could find that the robber (whoever he is) did not knowingly use a gun. It is not the robber's knowledge of the gun that is at issue here; it is his identity.

Still, the Court agrees with the Government that knowledge would be placed at issue if Mr. Joyner claims that he "lacked access to firearms and thus did not have an opportunity to commit armed robbery." Gov't's Reply in Supp. Suppl. Mot. at 3. In that situation, evidence of

---

[8] The photographs might have more relevance in this regard if the Government had sought to connect the firearms depicted therein to the ones used to commit the charged offenses. But the Government has not represented that it seeks to introduce the five photographs as proof that the firearms in the photographs are the same as those used in the charged offenses. The Court therefore need not address whether, under those circumstances, such photographs might otherwise be admissible under Rule 404(b).

Mr. Joyner's uncharged firearm possession could come in pursuant to Rule 404(b) "*not* to show [his] propensity to possess firearms, but as 'similar acts' evidence to prove, *inter alia*, his access to firearms and thus his 'knowledge' or the 'absence of [a] mistake or accident.'" *United States v. Sepulveda*, 420 F. Supp. 3d 153, 164 (S.D.N.Y. 2019) (quoting Fed. R. Evid. 404(b)(2)).  Such evidence becomes admissible once a defendant proffers a "lack of access" or "lack of possession" defense.  *Cf. id.* ("To be sure, evidence of uncharged firearms is irrelevant, and thus inadmissible, if the defendant takes a position that completely removes his mental state . . . from dispute at trial.").  Thus, if Mr. Joyner testifies that he lacked ready access to firearms, evidence that he used a gun a few months before the charged offenses (Two-Tone Gun Photos) and in the middle of the offenses (April 20 Photo) would bear directly on this defense and could therefore be admitted as rebuttal evidence under Rule 404(b).

Another court in this District recently reached a similar conclusion.  In *United States v. Fairnot*, the defendant was charged with constructive possession of two firearms found in his car, and the prosecution moved to admit text messages from his phone discussing firearm sales to prove his knowledge and absence of mistake with respect to the recovered guns.  No. 23-cr-24, 2025 WL 3534277, at *1 (D.D.C. Dec. 10, 2025).  The district court admitted messages discussing the sale of a firearm of the same make and caliber as one of the recovered guns as intrinsic evidence of the charged offense, as the messages helped explain "how Fairnot might have come to possess such a weapon and constitute direct evidence . . . that Fairnot knowingly possessed the recovered [weapon]." *Id.* at *6.  But the court declined to admit similar messages concerning an unrelated pistol, explaining that such messages "reveal[ed] little about Fairnot's intent or absence of mistake in knowingly possessing" the recovered guns. *Id.*  Still, the court went on to find that the latter messages would be relevant and admissible as rebuttal evidence if

the defendant "were to testify that he lacked familiarity with firearms in general," as the messages "would speak directly to his acquaintance with firearms." *Id.* The court therefore permitted the prosecution to offer these messages in rebuttal, but "*only if* Defendant . . . open[ed] the door by placing his knowledge of firearms at issue." *Id.*

Here, the Government anticipates that Mr. Joyner will raise a "lack of possession" defense at trial. *See* Gov't's Reply in Supp. Mot. at 2. It notes that at the time of the charged conduct, Mr. Joyner had prior felony convictions that precluded him from lawfully possessing firearms. *Id.* According to the Government, Mr. Joyner could therefore argue that he did not commit the offenses charged because he knew he was a felon who was not permitted to possess firearms and who therefore did not have access to firearms. Gov't's Reply in Supp. Suppl. Mot. at 5. On the current record, however, it is unclear to the Court whether Mr. Joyner will pursue this defense. Mr. Joyner has neglected to confirm this, and in his opposition brief, he emphasizes that he "has not opened the door to the admission of otherwise inadmissible firearm evidence." Def.'s Opp'n to Gov't's Suppl. Mot. at 7 (citation modified).

The Court will therefore preclude the Government from moving to introduce photographs of Mr. Joyner's prior firearm use until and unless Mr. Joyner raises a defense opening the door to this evidence.[9] *Cf. United States v. Midyett*, 603 F. Supp. 2d 450, 454–55 (E.D.N.Y. 2009) (barring the government from introducing Rule 404(b) evidence in its case-in-chief to rebut a lack-of-possession defense where it was unclear whether the defendant would pursue this defense); *United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996) ("Although the government is required under 18 U.S.C. § 922(g)(1) to prove defendant's knowledge of the

---

[9] If Mr. Joyner raises such a defense in opening statements or cross-examination of a Government witness, the Government is, of course, free to move to introduce these photographs during its case-in-chief.

firearm . . . prior bad acts are not admissible to prove defendant's knowledge unless defendant

places his mental state at issue or his knowledge of the firearm is not inferable from proof of

possession itself."). If Mr. Joyner raises such a defense, the Government is free to renew its

motion to admit the photographs. At that point, the Court will consider whether any of the

photos, although admissible under Rule 404(b), must nevertheless be excluded as unfairly

prejudicial under Rule 403.[10]

   b. *Evidence of Clothing Worn During Arrest on April 26, 2023*

Second, the Government also seeks to introduce evidence of the clothing Mr. Joyner

wore during his April 26, 2023, arrest—for an offense not charged in the instant case—for the

purpose of proving his identity as the perpetrator of Armed Carjacking 1 and Armed Robberies 2

and 3.[11] Gov't's Suppl. Mot. at 3–4. As explained above, although Rule 404(b) precludes the

---

[10] Mr. Joyner suggests that the Two-Tone Gun Photos should not be admitted because the Government failed to "provide reasonable [written] notice" of its intent to introduce them. Fed. R. Evid. 404(b)(3)(A); Def.'s Opp'n to Gov't's Suppl. Mot. at 3 n.1, ECF No. 122. However, Rule 404(b) requires that the prosecutor provide written notice "before trial," which the Government here has done. Fed. R. Evid. 404(b)(3)(C). And the Court has now ordered the Government to provide Mr. Joyner with further context for the Two-Tone Gun Photos. Under the circumstances, the Court does not believe that Mr. Joyner will be prejudiced in the preparation of his defense.

[11] The Government also provided notice of its intent "to [e]licit at trial the fact that [Mr.] Joyner's [home] address is included in Prince George's County Commissioner paperwork when he was arrested on April 26, 2023." Gov't's Suppl. Mot. at 1. Mr. Joyner challenged the paperwork as hearsay. *See* Def.'s Opp'n to Gov't's Suppl. Mot. at 8–9. However, in reply, the Government clarified that it does not seek to admit the paperwork, but instead to elicit testimony of statements Mr. Joyner made to a police officer. *See* Gov't's Reply in Supp. Suppl. Mot. at 5–6. The Government provides body-worn camera footage showing that after Mr. Joyner was arrested, he disclosed his first and middle name and "current address" to a police officer. *See id.* at Ex. 1 at 18:36:45. The Court agrees with the Government that these statements are not hearsay under Rule 801(d)(2). *See* Fed. R. Evid. 801(d)(2)(A) (noting that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party in an individual or representative capacity"); *United States v. Houston*, 40 F. App'x 836, 839 (4th Cir. 2002) ("To the extent Houston avers his statements made to police officers were inadmissible hearsay, an out-of-court statement by a party against that party is admissible."). Nevertheless, at the motions hearing, defense counsel stated that in the last few days, the Government informed counsel that

use of evidence of other crimes, wrongs, or acts to prove a defendant's character, the Rule "specifically lists 'identity' as one of the purposes for which [such evidence] may be admissible." *United States v. Lawson*, 410 F.3d 735, 741 (D.C. Cir. 2005).  At this stage of the Rule 404(b) analysis, the Court must balance probative value against "the prejudice that 'lies in the danger of jury misuse of the evidence.'" *United States v. Mitchell*, 49 F.3d 769 (D.C. Cir. 1995) (quoting *United States v. Brown*, 490 F.2d 758, 764 (D.C. Cir. 1973)).

On the threshold question of purpose, the evidence the Government seeks to introduce as to Mr. Joyner's identity satisfies Rule 404(b).  The Government's proffered evidence here includes body-worn camera footage and/or still photographs of Mr. Joyner's attire when officers arrested him on April 26, 2023, for the unauthorized removal of a motor vehicle and related theft in Oxon Hill, Maryland.  *See* Gov't's Suppl. Mot. at 7–8.  These images show that Mr. Joyner was wearing gray New Balance shoes and a necklace with a double "S" medallion upon arrest.  *See id.* at 8–9 fig. 4; Gov't's Reply in Supp. Suppl. Mot. at 7–9.

The Court agrees with the Government that these articles of clothing are "similar to the distinctive pieces [of] attire of the person captured on video from the earlier armed carjacking and robberies charged in this case."  Gov't's Suppl. Mot. at 11.  In particular, the necklace captured during Mr. Joyner's April 26, 2023, arrest strongly resembles the necklace that the suspect was pictured wearing shortly after Armed Carjacking 1 on April 13, 2023.  *Compare* Gov't's Suppl. Mot. at 8 fig. 4, *with id.* at 5 fig. 1.  Mr. Joyner was also pictured wearing a double "S" necklace during his May 2, 2023, arrest in connection with this case.  *See id.* at 9 fig.

---

when Mr. Joyner was arrested in the present case on May 2, 2023, he also told police officers that he lived at the Valley Avenue address. *See* Hr'g Tr. at 22:5–7. If the Government can elicit Mr. Joyner's address from the May 2 arrest, the Court sees no need for it to use the April 26 arrest to prove this fact.

5.  Likewise, the gray shoes Mr. Joyner wore during his April 26, 2023, arrest resemble those captured in surveillance footage from Armed Carjacking 1 and Armed Robberies 2 and 3, as well as those found in his residence on May 2, 2023.  *See id.* at 10 figs. 6–7.  In light of these similarities, the images from Mr. Joyner's arrest in late April are plainly probative of the perpetrator's identity with respect to the carjacking and robbery offenses at issue.  *Cf. Lawson*, 410 F.3d at 741 (concluding that Rule 404(b) evidence of a second, uncharged robbery was admissible because, *inter alia*, the perpetrator "appeared to wear the same clothes" during both robberies).  Indeed, Mr. Joyner concedes that the identity of the masked perpetrator of these offenses is a "central issue for trial," *see* Def.'s Mot. Preclude Improper Propensity-Based Args. at 2, ECF No. 100, reinforcing the probative value of the proffered evidence.

The Court is unpersuaded by Mr. Joyner's contrary argument that the evidence in question is nevertheless excludable under Rule 403 because it "is substantially more prejudicial than probative."  Def.'s Opp'n to Gov't's Suppl. Mot. at 9.  Mr. Joyner maintains that "generic" clothing, like a pair of gray shoes, is insufficiently distinctive to support admissibility under Rule 404(b).  *Id.* at 10 (citing *United States v. Askew*, 529 F.3d 1119, 1141 (D.C. Cir. 2008) (en banc)).  But this reasoning understates the particularity of the evidence the Government seeks to admit: viewed *in toto*, the double "S" necklace and gray New Balance shoes—including an oval-shaped marker visible on the tongue of one of the sneakers, *see* Gov't's Suppl. Mot. at 8 fig. 4, 10 fig. 7, 11—that the Government identifies in its images are manifestly distinctive enough to help establish the identity of the individual pictured in Armed Carjacking 1 and Armed Robberies 1 and 2.[12]

---

[12] The Court is similarly unconvinced by Mr. Joyner's argument that the Government has "very similar, non-prejudicial evidence it could offer" to establish identity, including other photographs of Mr. Joyner wearing the clothing at issue.  Def.'s Opp'n to Gov't's Suppl. Mot. at

Furthermore, the Rule 404(b) evidence here presents little inherent danger of prejudice as to Mr. Joyner. As this Court has underscored, "[w]hile there is always a risk that jurors will misuse [404(b)] evidence . . . to veer into an impermissible propensity inference, this risk, absent 'compelling or unique evidence of prejudice' . . . 'cannot give rise to a *per se* rule of exclusion.'" *United States v. Harris*, No. 19-cr-358, 2020 WL 6484311, at *3 (D.D.C. Nov. 4, 2020) (quoting *United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir. 2007)). No such compelling or unique evidence of prejudice exists here. For one, the Government has provided example images from the April 26 arrest that are cropped so that it is not evident that Mr. Joyner is in handcuffs. *See* Gov't's Reply in Supp. Suppl. Mot. at 7–9. The Government also appears to be amenable to presenting evidence from this incident without explaining that it depicts Mr. Joyner being placed under arrest. *See* Hr'g Tr. at 25:15–21 (suggesting that the Government could state simply that Mr. Joyner had "contact with the police" on this date). However, as explained below, *see infra* pp. 52–54, the Government intends to elicit evidence from the arresting officer, and if this officer testifies, it may not be possible to omit all references to the arrest.[13] Nevertheless, the Government has stated that it "does not intend to elicit *any facts as to why* the Defendant was

---

10–11. It is true that the Government has other photos from April and May of 2023 in which Mr. Joyner is wearing the double "S" necklace and the gray New Balance shoes. *See* Gov't's Suppl. Mot. at 9 fig. 5. But to the extent the Government seeks to use its Rule 404(b) evidence to highlight, for example, that Mr. Joyner wore the double "S" necklace and gray shoes *on numerous occasions* proximate to the carjacking and robberies, *see id.* at 9, the Court finds that evidence of the April 26 arrest—in combination with other images from around this time of Mr. Joyner in the same attire—is probative. Furthermore, as explained below, the risk of prejudice associated with showing images from the April 26 arrest can be minimized with appropriate redactions.

[13] The Government should endeavor to present evidence from the April 26 arrest in a sanitized manner, including, if possible, by avoiding mentioning that Mr. Joyner was arrested on that date. Nevertheless, if it finds it impracticable to do so, it may raise the issue again to the Court.

arrested" on April 26, 2023.[14]  Gov't's Reply in Supp. Suppl. Mot. at 5.  Ultimately, the Court finds that the risk of unfair prejudice to Mr. Joyner is sufficiently minimized if the Government is limited to introducing sanitized media from the arrest, such as images in which no handcuffs are visible.

   *c.  Evidence of Fraudulent Transaction that Occurred on 7-Eleven Employee's Credit Card*

Third, the Government seeks to introduce a fraudulent transaction that B.H., an unindicted co-conspirator, conducted using the credit card of a victim of Armed Robbery 3. Gov't's Suppl. Mot. at 11.  In this offense, the Government alleges that, on April 17, 2023, Mr. Joyner stole personal belongings from T.R. and I.D., including T.R.'s credit card, during his robbery of a 7-Eleven in Alexandria, Virginia.  *Id.*  Mr. Joyner allegedly proceeded to give T.R.'s stolen credit card to B.H., his female associate, who then attempted to make an online transaction.  *Id.* at 11–13.

As an initial matter, the Government argues that evidence of B.H.'s fraudulent transaction is "intrinsic" to Armed Robbery 3 and therefore admissible regardless of whether it satisfies Rule 404(b).  *See* Gov't's Suppl. Mot. at 14–16.  "Courts have denominated evidence of the same crime 'intrinsic' and evidence of 'other' crimes 'extrinsic.'"  *Bowie*, 232 F.3d at 927. This Court is skeptical that evidence of the fraudulent transaction—which occurred roughly an hour after the perpetrator of Armed Robbery 3 robbed the 7-Eleven—qualifies as intrinsic under the D.C. Circuit's demanding standard.  *See id.* at 929 (explaining that uncharged acts must be "performed contemporaneously with the charged crime" and must "facilitate the commission of

---

[14] In light of this representation, the Court does not find that Mr. Joyner's arrest for "*very similar* crimes" on April 26 will give rise to impermissible propensity inferences among the jury. *See* Def.'s Reply in Supp. Mot. Exclude Crim. History at 3, ECF No. 132.

the charged crime" to be deemed intrinsic).  But in any event, the Court finds that the evidence is admissible under Rule 404(b).

Specifically, the Government's fraudulent-transaction evidence is admissible for the purpose of establishing identity under Rule 404(b), because it tends to show that Mr. Joyner was the perpetrator of Armed Robbery 3.  On April 17, 2023, T.R. told an Alexandria officer responding to Armed Robbery 3 that he had just received notice of an unauthorized transaction for $490 on his stolen credit card, completed via the Shopify platform.  Gov't's Suppl. Mot. at 12.  Shopify gave law enforcement information indicating that the transaction was attempted about an hour after the robbery of the 7-Eleven, and that the transaction was linked to B.H.'s recently activated AT&T account.  *See id.* at 13; Gov't's Reply in Supp. Suppl. Mot. at 10.  Law enforcement subsequently retrieved an iCloud video from six days before the robbery, which appears to show B.H. kissing Mr. Joyner.  *See* Gov't's Suppl. Mot. at 13–14 fig. 10.  Given the unauthorized charge's temporal proximity to Armed Robbery 3 and the fact that this charge came from an associate of Mr. Joyner, the proffered evidence is probative with respect to identity.  In short, the strong nexus between the fraudulent-transaction evidence and Mr. Joyner himself buttresses the Government's claim that the masked man pictured inside the Alexandria 7-Eleven is Mr. Joyner.  *See id.* at 17.

Moreover, as with the April 26 arrest images described earlier, there is minimal unfair prejudice attendant to the admission of this evidence.  Mr. Joyner worries about the "general propensity inference" that the fraudulent-transaction evidence would encourage among jurors.  Def.'s Opp'n to Gov't's Suppl. Mot. at 12 (quoting *Mitchell*, 49 F.3d at 777).  But it bears repeating that the Government does not intend to introduce the fraudulent-transaction evidence to establish Mr. Joyner's "general propensity" to commit offenses like Armed Robbery 3.  Instead,

the Government seeks to produce a set of sanitized, non-inflammatory files—namely, a "limited number of financial records showing the fraudulent use of the victim's credit card shortly after the robbery" and the iCloud video—at trial for the targeted purpose of demonstrating Mr. Joyner's involvement in the specific, charged offenses at hand.  Gov't's Reply in Supp. Suppl. Mot. at 11–12.  Under these circumstances, no "compelling or unique evidence of prejudice" exists to compel exclusion of the proffered evidence.[15]  *Harris*, 2020 WL 6484311, at *3 (quoting *Douglas*, 482 F.3d at 601).

### 2.  Rule 609 Motion

If Mr. Joyner testifies at trial, the Government seeks to impeach him with evidence of several prior convictions pursuant to Federal Rule of Evidence 609.  Gov't's Mot. at 39–43.  In particular, the Government seeks permission to introduce the three following convictions:

- First-Degree Burglary in Prince George's County, Maryland Circuit Court case number CT111819B – Convicted on October 18, 2012 and sentenced to 20 years' imprisonment with 15 years suspended;
- Third-Degree Burglary in Prince George's County, Maryland Circuit Court case number CT120446B – Convicted on October 3, 2012 and sentenced to 10 years' imprisonment with five years suspended;
- Theft of Property or Services with a Value More than $1,500 and Less Than $25,000 in Prince George's County, Maryland Circuit Court case number CT181645X – Convicted on January 14, 2020 and sentenced to 90 days' imprisonment.

---

[15] Mr. Joyner also suggests that the evidence is unfairly prejudicial because it involves the alleged crime of an associate, B.H., and because "the Government has not presented evidence that Mr. Joyner gave the stolen credit card to B.H."  Def.'s Opp'n to Gov't's Suppl. Mot. at 12–13.  The Circuit precedent he cites on this point is inapposite.  In *United States v. Williams*, 561 F.2d 859 (D.C. Cir. 1977), evidence of stolen proceeds found in the co-occupied apartment of the defendant's sister was inadmissible where the defendant lacked any further, established connection to the apartment (beyond that "blood relationship").  *Id.* at 413.  As presented, the evidence was prejudicial because the sister's roommate had already admitted to participating in the robbery at issue, a critical fact that could have borne on the defendant's innocence but that the jury was not told at trial.  *See id.*  Here, however, there is both a strong probative connection between Mr. Joyner and his associate's fraudulent transaction—considering, again, the timing of the iCloud video as well as the timing of the transaction relative to Armed Robbery 3—and a lack of any demonstrated prejudice akin to that in *Williams*.

Gov't's Opp'n to Def.'s Mot. Exclude Crim. History at 3 & n.3, ECF No. 114.[16]

In the D.C. Circuit, "all felonies have some probative value on the issue of credibility." *United States v. Moore*, 75 F. Supp. 3d 444, 455 (D.D.C. 2014) (quoting *United States v. Lipscomb*, 702 F.2d 1049, 1062 (D.C. Cir. 1983) (en banc)). For this reason, the D.C. Circuit broadly favors the admission of past criminal convictions for impeachment purposes. *See United States v. Lewis*, 626 F.2d 940, 950 (D.C. Cir. 1980) ("Courts should be reluctant to exclude otherwise admissible evidence that would permit an accused to appear before a jury as a person whose character entitles him to complete credence when his criminal record stands as direct testimony to the contrary.").

Relevant here, Rule 609 in fact *requires* the admission of a criminal defendant's prior convictions for purposes of impeachment if the crime "was punishable by death or by imprisonment for more than one year"—that is, the crime was a felony—and "the probative value of the evidence outweighs its prejudicial effect," provided that no more than ten years have passed since the defendant's conviction or release from confinement for it, whichever is later. Fed. R. Evid. 609(a)(1)(B). Rule 609 also requires the admission of convictions, even for crimes punishable by less than one year, if the conviction for the crime required proof of "a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

Mr. Joyner's prior convictions were for felonies and fall within the ten-year window.[17] *See* Gov't's Mot. at 40. Accordingly, under Rule 609, their admissibility "turns on whether 'the

---

[16] The Government also lists a separate conviction for attempted distribution of a controlled substance, Gov't's Opp'n to Def.'s Mot. Exclude Crim. History at 3 n.3, but its original motion indicates only that it intends to use the burglary and theft convictions for impeachment at trial, Gov't's Mot. at 40.

[17] A stricter standard governs the admissibility of one's criminal history where "more than 10 years have passed since the witness's conviction *or* release from confinement for it, *whichever is later*." Fed. R. Evid. 609(b) (emphases added). Fewer than ten years have passed

25

probative value of the evidence outweighs its prejudicial effect.'" *Moore*, 75 F. Supp. 3d at 455 (quoting Fed. R. Evid. 609(a)(1)(B)).  Per *United States v. Jackson*, relevant factors in this balancing inquiry include (1) the nature of the past crime, (2) the time of conviction, (3) the crime's similarity to the charged crime, (4) the importance of the defendant's testimony, and (5) the extent to which the defendant's credibility is central to the case.  627 F.2d 1198, 1209 (D.C. Cir. 1980).  Within this inquiry, Rule 609 "creates a *per se* rule that probativeness outweighs prejudice for crimes 'involv[ing] dishonesty or false statement.'" *Lipscomb*, 702 F.2d at 1064 (quoting Fed. R. Evid. 609(a)(2), amended 2011).

Considering each of the *Jackson* factors in turn, the Rule 609 balancing analysis supports admission of Mr. Joyner's prior convictions.  On the nature-of-crime prong, D.C. Circuit precedent recognizes "that crimes of stealth (*e.g.*, smuggling, burglary), while not quite crimes of 'dishonesty or false statement' [under 609(a)(2)], do reflect lack of credibility and should be admitted unless significantly prejudicial." *Id.* at 1057.  Because Mr. Joyner's first- and third-degree burglary convictions are plainly "crimes of stealth" under this formulation, the Court agrees with the Government that such convictions will bear on Mr. Joyner's credibility in the eyes of the jury.

Mr. Joyner's theft conviction is a closer call on the nature-of-crime prong, but the Court finds that the context of this particular conviction renders the theft probative of credibility.  *See United States v. Parker*, No. 25-cr-96, 2026 WL 482530, at *7 (D.D.C. Feb. 20, 2026) ("[T]heft and larceny may be probative of a character for truthfulness, depending on the circumstances.");
*cf. United States v. Crawford*, 613 F.2d 1045, 1052 (D.C. Cir. 1979) ("Shoplifting may or may

---

since Mr. Joyner's release from imprisonment for each of the proffered convictions, so this standard does not apply.  *See* Gov't's Opp'n to Def.'s Mot. Exclude Crim. History at 3 n.3; Gov't's Mot. at 40–41.

26

not be probative of a lack of veracity, depending on the nature and circumstances of the crime

[e.g., discreetness or duplicity involved in the crime as committed].").  Although Mr. Joyner was

acquitted of connected burglary charges, he was convicted of theft in 2020 after he broke into an

individual's home and stole items.  Gov't's Reply in Supp. Suppl. Mot. at 13 & Ex. 2.  As such,

the theft was akin to a crime of stealth, offering the jury a permissible basis on which to assess

Mr. Joyner's credibility if he testifies at trial.  In any event, even if this Court did *not* find the

crime to be one of stealth, the theft would remain probative because it is "a serious crime that

shows conscious disregard for the rights of others." *Lipscomb*, 702 F.2d at 1071.  The theft thus

goes toward credibility.  *See id.*; *see also United States v. Estrada*, 430 F.3d 606, 617 (2d Cir.

2005) (noting that crimes involving deceit, fraud, and theft "reflect adversely on a person's

integrity and . . . therefore bear on honesty").

     None of the remaining *Jackson* factors militates against the Government's proffered

impeachment evidence.  On timing, Mr. Joyner was released from confinement for each of the

convictions within the ten-year window identified in Rule 609(b).  The three convictions are also

not similar enough to Mr. Joyner's charged crimes here to engender significant prejudice.

Although these convictions and the instant, charged offenses both "involve the defendant taking

property that did not belong to him," Gov't's Mot. at 42, the Court finds the former meaningfully

different from the latter.  As the Government stresses, the burglary and theft crimes were non-

confrontational and non-forcible in nature, and they did not involve the use of a firearm.  *Id.*  Use

of a firearm is central to the Government's allegations of armed robbery and carjacking in this

case, and such use is a material element of the § 924(c) and § 922(g) counts charged.[18]  In view

---

[18] Given the significant distance between Mr. Joyner's past convictions and the charged
crimes here, this case is a far cry from the cases Mr. Joyner adduces in support of exclusion.  *See
United States v. Jones*, 67 F.3d 320, 324 (D.C. Cir. 1995) (finding undue prejudice where prior

of these substantial differences, there is little danger that the jury, with proper instructions, will use the Government's evidence of past convictions to make propensity inferences. *See Jackson*, 627 F.2d at 1210. Mr. Joyner's further assertion that such evidence is unnecessary because "the defense will not contest Mr. Joyner's felon status" at trial, Def.'s Reply in Supp. Mot. Exclude Crim. History at 2, ECF No. 132, is unavailing: the mere fact that Mr. Joyner is a felon, without some explication of the basic nature of his prior convictions, cannot speak to his credibility in quite the same way as the proffered Rule 609 evidence—including, as discussed above, convictions for "crimes of stealth."

On the last two *Jackson* factors, the Court finds that Mr. Joyner's testimony would be important at trial and his credibility is central to the case. Here, "what [Mr. Joyner] might say in his own defense" as to his participation in the charged offenses could evidently "play a significant role in the jury's verdict." *Moore*, 75 F. Supp. 3d at 455. It follows that Mr. Joyner's credibility, should he choose to testify at trial, will be critical to the Government's prosecution and to Mr. Joyner's defense in this case. On the whole, these factors confirm the high probative value of the Government's impeachment evidence in satisfaction of Rule 609, particularly considering the D.C. Circuit's liberal interpretation of the rule.

As a final matter, the Government requests permission to "conduct a greater inquiry into the essential facts surrounding the conviction" if Mr. Joyner "opens the door to additional inquiry by attempting to 'explain away' the conviction or minimize its significance" at trial. Gov't's Opp'n to Def.'s Mot. Exclude Crim. History at 3 (quoting *United States v. Williams*, No. 22-cr-332, 2023 WL 5973993, at *8 n.4 (D.D.C. Sept. 14, 2023)). In the D.C. Circuit,

---

convictions and charged crimes were "*virtually identical*" (emphasis added)); *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967) ("Convictions which are for the *same crime* should be admitted sparingly." (emphasis added)).

impeachment of a witness under Rule 609 is "usually limited to the essential facts"—i.e., the fact of a prior conviction and its general nature—"rather than the surrounding details of the conviction." *Williams*, 2023 WL 5973993, at *8 (quoting *United States v. Baylor*, 97 F.3d 542, 544 (D.C. Cir. 1996)). But as the Government suggests, a "consensus" has surfaced among courts, including this Circuit, that further inquiry into surrounding details is appropriate if a defendant tries to explain away a past conviction. *Tri-State Hosp. Supply, Inc. v. United States*, 471 F. Supp. 2d 170, 174 (D.D.C. 2007); *see also United States v. Butler*, 924 F.2d 1124, 1130 (D.C. Cir. 1991) (concluding that, on cross-examination, prosecutor was entitled to invoke "some of the details of the [defendant's] previous convictions" after he attempted to minimize his misconduct).

In keeping with this reasoning, the Government may draw on the details surrounding Mr. Joyner's past convictions *if* he opens the door to such an inquiry during his testimony. However, Mr. Joyner's procedural concerns about what, exactly, constitutes "open[ing] the door" are well-taken. *See* Def.'s Reply in Supp. Mot. Exclude Crim. History at 2. Under Rule 104, the Court must conduct any hearing on a preliminary question of admissibility if "a defendant in a criminal case is a witness and so requests." Fed. R. Evid. 104(c)(2). As such, and in the interest of minimizing unfair prejudice to Mr. Joyner, the Government must seek a ruling from the Court (outside the jury's presence) before it attempts to introduce the surrounding details of Mr. Joyner's convictions at trial. Specifically, the Government may not introduce such evidence unless and until the Court rules "that Mr. Joyner has opened the door" to a greater inquiry and

establishes "precisely what additional details the Government may introduce as a result."  Def.'s

Reply in Supp. Mot. Exclude Crim. History at 2.[19]

### C.  Defendant's Motions *in Limine*

The Court finally addresses Mr. Joyner's various motions *in limine*.  "While neither the

Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for

motions *in limine,* the Court may allow such motions 'pursuant to the district court's inherent

authority to manage the course of trials.'"  *Barnes v. District of Columbia*, 924 F. Supp. 2d 74,

78 (D.D.C. 2013) (quoting *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984)).  "Motions *in*

*limine* are designed to narrow the evidentiary issues at trial."  *Williams v. Johnson*, 747 F. Supp.

2d 10, 14 (D.D.C. 2010).  A trial judge's discretion "extends not only to the substantive

evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an

evidentiary issue that is appropriate for ruling in advance of trial."  *Barnes*, 924 F. Supp. 2d at 79

(quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011)).

#### 1.  Propensity-Based Arguments (ECF No. 100)

Mr. Joyner moves *in limine* (1) to "preclude the Government and its witnesses from any

propensity-based statements that tend to imply that guilt for one offense may be considered as

corroborative evidence for any other offense," (2) to "preclude the Government and its witnesses

---

[19] Because the Court has now granted the Government's motions to introduce evidence from Mr. Joyner's April 26 arrest pursuant to Federal Rule of Evidence 404(b), as well as its motion to introduce evidence of his prior convictions for impeachment purposes under Rule 609, the Court denies Mr. Joyner's motion *in limine* to exclude references to his criminal history with respect to these issues.  *See* Def.'s Mot. Exclude Crim. History, ECF No. 99.  The sole issue remaining from the latter motion was whether the Government should be allowed to introduce evidence regarding Mr. Joyner's prior felony convictions to satisfy the requisite element of his § 922(g) felon-in-possession charges (Counts 3 and 28).  *See id.* at 2.  At the motions hearing, defense counsel informed the Court that Mr. Joyner had agreed to a stipulation regarding his criminal history.  *See* Hr'g Tr. at 2:12–18.  The Court therefore denies Mr. Joyner's motion in its entirety.

from using any prejudicial language that may tend to imply such an inference," and (3) "for appropriate limiting orders so instructing the jury, pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence."  *See* Def.'s Mot. Preclude Improper Propensity-Based Args. ("Def.'s Mot. Preclude Propensity-Based Args."), ECF No. 100.  In short, Mr. Joyner argues that joinder of the counts underlying Armed Robberies 1–10 and Armed Carjackings 1–2 in a single trial creates a heightened risk of prejudice—because the jury may cumulate the evidence of the separate crimes, consider the separate evidence as mutually corroborative, or conclude from the numerous charges that Mr. Joyner has a criminal disposition—and urges the Court to impose his requested limitations to mitigate this risk.  *Id.* at 1–2 & n.2.  The Government opposes, arguing that Mr. Joyner will suffer no prejudice from joinder.  *See* Gov't's Opp'n to Def.'s Mot. Preclude Propensity-Based Args. at 1–2, ECF No. 112.  As explained below, the Court grants Mr. Joyner's motion in part and denies it in part.

As an initial matter, the Court addresses the parties' disagreement about whether Mr. Joyner will be prejudiced by the joinder of the counts in this case.  The question is not *whether* Mr. Joyner will be prejudiced; "[c]ertainly, some prejudice always results from the joinder of counts."  *United States v. Johnson*, No. 14-cr-412, 2015 WL 1967239, at *7 (N.D. Cal. Apr. 30, 2015); *see also United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976) ("One inevitable consequence of a joint trial is that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another."); *United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940) ("[E]ven when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one").  Nevertheless, as the Court explained when it denied Mr. Joyner's motion to sever the counts underlying Armed Carjacking 1, "[j]oinder is the rule rather than the exception and the burden is upon a moving defendant to

show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." Mem. Op. at 11, ECF No. 140 (quoting *United States v. Treadwell*, 566 F. Supp. 80, 86 (D.D.C. 1983)). The Court also explained that if the Government's presentation of the evidence for the joined counts turns out to create a risk of undue prejudice, curative jury instructions may well be proper. *Id.* at 11–12.

In his present motion, Mr. Joyner has not moved to sever any of the other counts of the Superseding Indictment. Nor has he moved to preclude any specific evidence based on a risk of prejudice. *See* Def.'s Mot. Preclude Propensity-Based Args. at 6 (requesting that the Court preclude "the cross-admission of evidence between charges for any other purpose not permitted by Rule 404(b)(2)" while recognizing evidence complying with that rule is cross-admissible); *United States v. Rodriguez Delgado*, No. 22-cr-304, 2023 WL 8354928, at *5 (D.D.C. Dec. 1, 2023) ("The cross-admissibility of evidence concerning each count is, in turn, determined by looking to Federal Rule of Evidence 404(b).").

The Court nevertheless takes the opportunity to explain the circumstances under which the evidence supporting each count will be cross-admissible pursuant to Rule 404(b). As noted previously, Rule 404(b) provides that "[e]vidence of any other crime, wrong is not admissible to prove a person's character" but is, however, admissible for other purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2). The Government represents that it seeks to introduce evidence from certain charged robberies in connection with other charged robberies for the purpose of proving Mr. Joyner's "identity." Gov't's Opp'n to Def.'s Mot. Preclude Propensity-Based Args. at 4–5. The Government explains that because the identity of the perpetrator of the charged offenses is disputed—given that the perpetrator wore a mask during the charged

32

robberies and no victim will identify Mr. Joyner as the perpetrator—it will have to rely on other identifying evidence to prove identity, including distinctive clothing worn by the perpetrator during several of the charged offenses, repeated use of the same items, surveillance footage and DNA evidence.  *Id.* at 5.

Where evidence of another crime is offered under Rule 404(b) to prove that the perpetrator of that crime must have been the same person as the perpetrator of the second crime, two conditions must be met.  First, "evidence that a defendant committed another crime . . . is only relevant, and hence potentially admissible, if a reasonable jury could find by a preponderance of the evidence that the defendant, and not someone else, was responsible for the [other] crime."[20]  *United States v. Burwell*, 642 F.3d 1062, 1066 (D.C. Cir. 2011), *aff'd*, 690 F.3d 500 (D.C. Cir. 2012) (en banc).  Second, "[t]o be relevant to identity, the other crimes must share similar characteristics with the charged acts."  *Id.* at 1067.  As the D.C. Circuit has explained, the level of similarity between two crimes that is necessary to render evidence of one crime relevant to prove the identity of the perpetrator of the other crime is satisfied if "there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual or distinctive facts relating to the manner in which the crimes were committed."  *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964).

In *Drew*, the D.C. Circuit concluded that this standard was not met in a trial joining two robbery charges where the similarities amounted to "the nature of the offense, the fact that both offenses were committed against High stores, and the fact that the offender in both instances was a Negro wearing sunglasses."  *Id.* at 92.  In the D.C. Circuit's view, "[t]hese circumstances all fit

---

[20] Other crimes evidence may conditionally be admitted at trial "subject to the requirement that the government later introduce sufficient evidence for the jury reasonably to find that the defendant committed those crimes."  *Burwell*, 642 F.3d at 1066.

into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort." *Id.* at 93. Similarly, in *United States v. Carter*, the D.C. Circuit found that joinder of various robbery charges in the same trial resulted in prejudicial error where "[t]he scene of the . . . offenses was different, the victims were different, and the only common factor was that in each case the offender was a man wearing a fur coat and fur hat." 475 F.2d 349, 350–51 (D.C. Cir. 1973).

On the other hand, in *United States v. Lawson*, the D.C. Circuit more recently ruled that evidence of an uncharged bank robbery had been properly admitted in the trial of separate bank robbery to prove identity where "[b]oth were executed by a taller man wielding a distinctive silver-hammered handgun and a shorter man who collected money from the tellers, and the taller individual appeared to wear the same clothes during both crimes." 410 F.3d at 741. And in *United States v. Carr*, the D.C. Circuit found that five charged bank robberies were sufficiently similar such that, had they been tried separately, evidence concerning each count would have been admissible on each other count to prove identity where all five were committed by "a black male in his 20s or 30s, who had a thick, unkempt beard and wore a heavy jacket and either a baseball cap or a knit hat" and who, in each robbery, passed the teller a demand note that he then asked be returned to him. 373 F.3d 1350, 1352–53 (D.C. Cir. 2004); *see also United States v. Levi*, 45 F.3d 453, 455 (D.C. Cir. 1995) (same conclusion reached for bank robbery charges where "the *modus operandi* in all of the robberies was strikingly similar—the perpetrator used similar notes, made similar statements and gestures, wore similar clothing, and robbed banks . . . in the same general area of the city").

Here, the Court finds that many of the charged offenses share sufficient characteristics to permit an inference that the same individual committed them. To be sure, some of the

34

similarities underlying the offenses are superficial.  For example, certain characteristics—that the perpetrator of the robberies was a tall, Black man with a slim build who largely targeted convenience stores, approached employees at gunpoint, and demanded cash from registers and employees' personal property—"are not in any way distinctive, but are similar to numerous other crimes committed by [other] persons." *United States v. Luna*, 21 F.3d 874, 879 (9th Cir. 1994) (citation omitted).  Nevertheless, the probability that at least some of the charged offenses were committed by the same person increases when factoring in that the offenses occurred in close temporal proximity around Washington, D.C., and neighboring counties in Maryland and Virginia.  In fact, five of the charged robberies and one of the carjackings occurred in the same 24-hour period.  And that probability becomes a near certainty when those circumstances are considered alongside the various distinctive items—including clothing and accessories—that recur across different subsets of the charged offenses.

For example, surveillance footage shows that the perpetrator of Armed Robberies 1, 4–7, and 10 wore a black-and-gray sweatshirt with a Pittsburgh Steelers logo emblazoned on one of its corners.  *See* Gov't's Mot. at figs. 1, 11–13, 15, 18.  And for Armed Robberies 4–7 and 10, the perpetrator additionally wore dark-colored sneakers with white soles and toes.  *See id.* at 31.  Mr. Joyner was wearing identical sneakers when he was arrested inside the Toyota RAV4 stolen in Armed Carjacking 2 on May 2, 2023, and an identical Pittsburgh Steelers sweatshirt was found beside him.  *Id.* at figs. 21–22.

Turning to another group of offenses—Armed Carjacking 1 and Armed Robberies 2–3— the perpetrator there wore gray sneakers with white soles.  *Id.* at 33.  That alone might not warrant an inference of identity.  But the perpetrator of Armed Carjacking 1 and Armed Robbery 2 additionally wore black shorts, gray compression pants, and dark socks—which, when

35

combined with the gray-and-white sneakers, strikes the Court as a sufficiently distinctive combination of clothing to support a "reasonable probability that the same person committed both crimes." *Drew*, 331 F.2d at 90. Similar sneakers and compression pants were later recovered from Mr. Joyner's home. Gov't's Mot. at 33. Furthermore, the perpetrator of Armed Robbery 3 wore a dark sweatshirt featuring a large yellow circle with the letters "PIT" in black text—apparently an unlicensed reference to Pittsburgh's professional ice hockey team. *Id.* at 10–11. An identical sweatshirt was later recovered from the trunk of the Honda HR-V stolen in Armed Carjacking 1.

Other shared accessories are also sufficiently unique to support an inference of identity. For example, the perpetrator of Armed Robbery 1 was wearing a necklace with a double "S" medallion—the same worn by an individual who fraudulently used a credit card belonging to the victim of Armed Carjacking 1 and by Mr. Joyner when he was arrested on May 2, 2023. Gov't's Opp'n to Def.'s Mot. Preclude Propensity-Based Args. at 5–7. And the perpetrator of Armed Robbery 7 wore a distinctive yellow mask with black script that was later recovered from the scene of Armed Robbery 8. *Id.* at 9–10. That mask was then submitted for DNA testing, which, according to the Government, detected DNA from two individuals, one of whom is consistent with Mr. Joyner. *Id.* at 10.

At this point, the Government has satisfied the Court that much of the evidence of the disparate charges—including the evidence described above—would be cross-admissible under Rule 404(b) to prove identity. For example, sweatshirts featuring references to the Pittsburgh Steelers or a Pittsburgh ice hockey team are—at least in Washington, D.C.—much more distinctive than the sunglasses in *Drew* and the fur coat and fur hat in *Carter* that the D.C. Circuit considered too common to support an inference of identity. *See Drew*, 331 F.2d at 92; *Carter*,

36

475 F.2d at 350–51.  And in *Lawson*, *Carr*, and *Levi*, the D.C. Circuit deemed relevant to the cross-admissibility analysis the fact that the perpetrators of the distinct offenses wore similar clothing.[21]  *See Lawson*, 410 F.3d at 741; *Carr*, 373 F.3d at 1352–53; *Levi*, 45 F.3d at 455.  Accordingly, the Court denies Mr. Joyner's first request to "preclude the Government and its witnesses from any propensity-based statements that tend to imply that guilt for one offense may be considered as corroborative evidence for any other offense."[22]  Def.'s Mot. Preclude Propensity-Based Args. at 1.

Mr. Joyner's second request to "preclude the Government and its witnesses from using any prejudicial language that may tend to imply such an inference" is denied to the extent it seeks to prevent the Government from calling attention to relevant similarities between the charged offenses.  *Id.* at 1.  It is also denied to the extent Mr. Joyner seeks to preclude the Government from using terms such as "spree," "conspiracy," "pattern," or "series" to refer to the charged offenses.  The Court does not find these terms to be inconsistent with the facts alleged in the Superseding Indictment, namely, that Mr. Joyner robbed ten stores and carjacked two

---

[21] At the motions hearing, defense counsel argued that for evidence from separate crimes to be cross-admissible to prove the perpetrator's identity, the crimes "have to be committed with a unique signature or strikingly similar *modus operandi*," which is not the case here.  Hr'g Tr. at 37:6–11.  However, rather than focusing exclusively on *modus operandi*, the D.C. Circuit has analyzed whether the two crimes "share[ ] sufficient characteristics to permit an inference of identity," including whether the perpetrator was wearing similar clothing.  *Lawson*, 410 F.3d at 741.

[22] By this request, the Court understands Mr. Joyner to be asking it to prevent the Government from arguing that evidence from one charged offense may be cross-admissible as evidence in a second charged offense.  That request is denied.  Nevertheless, because Mr. Joyner has not moved to exclude any specific identity evidence, he may renew any objection to the cross-admissibility of specific evidence at trial.  For any specific evidence of one charged offense to be cross-admissible on another offense, the Government must persuade the Court not only that the evidence is sufficiently distinctive as to be relevant to identity under Rule 404(b), but also that its probative value is not substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" under Rule 403.

vehicles in a three-week period. *Cf. United States v. McAllister*, 608 F. App'x 631, 633 (10th Cir. 2015) (holding that the government's characterization of a defendant's alleged criminal activity as a "crime spree" did not conflict with the facts stipulated in the plea agreement where the defendant "stipulated that he had participated in a five-year conspiracy and a scheme to embezzle funds"). Thus, the Government is permitted to refer to the charged offenses using such terms to highlight similarities between them relevant to proving the identity of the perpetrator of the offenses.

Separately, at the motions hearing, defense counsel explained that it also seeks to limit the Government from making statements that could lead the jury to cumulate the evidence between the charges, such as talking about the "total number of witnesses" or the "total scope of the investigation." Hr'g Tr. at 36:4–20. The Court agrees that the Government should be mindful to avoid making statements that could have such an effect on the jury. Indeed, the D.C. Circuit has found reversible error in part based on the prosecutor's remarks that invited the jury to find guilt on the combined evidence of the distinct charges. *See Carter*, 475 F.2d at 351 (criticizing the prosecutor's remarks in closing that "[w]ithin the same week, ladies and gentlemen, four individuals saw [the defendant] committing criminal acts in this city. Can four people be wrong?").

Finally, with respect to Mr. Joyner's third request for appropriate limiting instructions, the Court notes that the parties' proposed jury instructions include an instruction relevant to the consideration of evidence from multiple counts that is taken from the standardized Criminal Jury Instructions for the District of Columbia. *See* Gov't's Proposed Jury Instrs. § 2.402, ECF No.

38

141-2 (quoting Crim. Jury Instrs. for the Dist. of Columbia § 2.402).[23]  Furthermore, in its

opposition brief, the Government cited a similar instruction from the Model Criminal Jury

Instructions of the Third Circuit.[24]  *See* Gov't's Opp'n to Def.'s Mot. Preclude Propensity-Based

Args. at 13–14.  The Court will give an instruction consistent with these models in both its

preliminary instructions and its final instructions to the jury.

### 2.  In-Court Identification (ECF Nos. 54, 101)

Mr. Joyner moves to suppress and preclude in-court identification of Mr. Joyner as the

perpetrator of the charged crimes by any trial witness beyond the one cooperating witness the

Government has disclosed to date.  *See* Def.'s Mot. Suppress In-Court Identification as Unduly

Suggestive, ECF No. 54; Def.'s Mot. Suppress & Preclude In-Court Identification, ECF No. 101.

As Mr. Joyner explains, the Government has not provided him notice of any civilian or law

enforcement witnesses who can identify him other than the cooperator.  *See* Def.'s Reply in

Supp. Mot. Suppress & Preclude In-Court Identification at 1, ECF No. 133.  The Government

does not dispute this point.  Gov't's Opp'n to Def.'s Mot. Suppress & Preclude In-Court

Identification at 1–2, ECF No. 115.  Still, the Government notes that if it becomes aware of

additional identifying witnesses before trial, it "will make the necessary disclosures" pursuant to

---

[23] This instruction reads: "Each count of the Indictment charges a separate offense.  You should consider each offense, and the evidence which applies to it, separately, and you should return separate verdicts as to each count [unless I instruct you to do otherwise].  The fact that you may find the defendant guilty or not guilty on any one count of the Indictment should not influence your verdict with respect to any other count of the Indictment.  At any time during your deliberations you may return your verdict of guilty or not guilty with respect to any count."

[24] This instruction reads: "The number of offenses charged is not evidence of guilt, and this should not influence your decision in any way.  You must separately consider the evidence that relates to each offense, and you must return a separate verdict for each offense.  For each offense charged, you must decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of that particular offense.  Your decision on one offense, whether guilty or not guilty, should not influence your decision on any of the other offenses charged.  Each offense should be considered separately."

its discovery obligations. *Id.* at 1 n.1; *see also* Parties' Witness Lists at 1 n.1, ECF No. 141-3

(reserving right to supplement Government's witness list).

Because the Government represents that, at this time, it does not foresee calling any

witnesses—other than the cooperator—to make an in-court identification of Mr. Joyner, the

Court denies the instant request without prejudice. *See* Gov't's Opp'n to Def.'s Mot. Suppress &

Preclude In-Court Identification at 1. Mr. Joyner is free to renew his request if and when the

Government discloses any additional witnesses who could offer an inculpatory identification of

him at trial. The Court notes, however, that at this late date, such an untimely disclosure will be

viewed with disfavor absent extenuating circumstances.

### 3. Toolmark Identification (ECF No. 102)

Pursuant to Federal Rules of Evidence 403 and 702, as well as *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Mr. Joyner moves to limit the scope of the expert

testimony proffered by Michael Van Arsdale, a forensic examiner at the Federal Bureau of

Investigation ("FBI") Firearm and Toolmark Unit. *See* Def.'s Mot. Limit Scope of Michael Van

Arsdale's Test. ("Def.'s Rule 702 & *Daubert* Mot."), ECF No. 102; *id.* Ex. A ("Van Arsdale

Notice"), ECF No. 102-2. As relevant here, Armed Robbery 1 charges Mr. Joyner with

discharging a firearm while robbing a Falcon Fuel in Washington, D.C. on April 12, 2023, and

Armed Robbery 3 charges him with the same conduct at a 7-Eleven in Alexandria, Virginia on

April 17, 2023. Superseding Indictment at 1–2, 5–6. Security footage from each store shows

that the perpetrator wore a face mask and unidentical clothing during each incident. Def.'s Rule

702 & *Daubert* Mot. at 1. In order to show that these robberies were committed by the same

person—allegedly Mr. Joyner—the Government proposes to offer Mr. Van Arsdale's testimony

to opine on the likelihood that cartridge casings recovered from the scenes of Armed Robberies 1 and 3 were fired from the same firearm.  *See* Van Arsdale Notice.

Firearm and toolmark identification "is used to determine whether a bullet or casing was fired from a particular firearm" and "whether two bullets or casings were fired from the same firearm." *United States v. Brown*, 973 F.3d 667, 702 (7th Cir. 2020).  "An examiner can make these determinations by looking through a microscope to see markings that are imprinted on the bullet or casing by the firearm during the firing process." *Id.*  The Government offers Mr. Van Arsdale as an expert in the field to testify regarding (1) the process of toolmark identification and analysis, (2) his examination of the two cartridge casings recovered from the scenes of Armed Robberies 1 and 3, and (3) "what possible conclusions may be reached in performing the firearm pattern examinations." *See* Van Arsdale Notice.  As summarized in Mr. Van Arsdale's lab report, the results of his examination were that the cartridge casings from Armed Robberies 1 and 3 "were identified as having been fired in the same firearm," and that class characteristics on the casings "are physically consistent with having been fired in a Glock pistol, Smith & Wesson Sigma series pistol or similar firearms." *Id.* at Ex. 2.

Mr. Joyner argues that Mr. Van Arsdale's proposed testimony is inadmissible because toolmark analysis lacks a reliable scientific basis.  Def.'s Rule 702 & *Daubert* Mot. at 3–4.  He therefore seeks to limit Mr. Van Arsdale's toolmark identification testimony to "general principles." *Id.* at 3, 11.  In the alternative, he urges the Court to impose limitations to "narrow the scope of the testimony and prohibit prejudicial language that overstates the certainty of his analysis." *Id.* at 11.  The Government opposes the motion, arguing that "unrefuted scientific data demonstrat[es] the reliability of firearms and toolmark identification."  Gov't's Opp'n to Def.'s

Rule 702 & *Daubert* Mot. at 1, ECF No. 120.[25]  For the reasons below, the Court grants Mr. Joyner's motion in part and denies it in part.

Federal Rule of Evidence 702 provides that qualified expert testimony is admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.  "In general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing *Daubert v*, 509 U.S. at 587); *see also* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").  As the Supreme Court has clarified, it is not exclusion, but rather "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that "are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

When considering whether expert evidence is admissible under Rule 702, district courts are required to "assume a 'gatekeeping role,' ensuring that the methodology underlying an expert's testimony is valid and the expert's conclusions are based on 'good grounds.'"

---

[25] Mr. Joyner has moved to strike the Government's 62-page opposition brief or, in the alternative, strike the final 17 pages, because it exceeds the 45-page limit imposed by Local Criminal Rule 47(e).  *See* Def.'s Mot. Strike Gov't's Noncompliant Br. ("Def.'s Mot. Strike"), ECF No. 128.  In response, the Government recognizes that it was an "oversight" for it to file its brief without requesting leave from the Court.  *See* Gov't's Opp'n to Def.'s Mot. Strike, ECF No. 145.  Although the Court is not pleased by the Government's failure to draft a concise brief, the Court will exercise its discretion and consider the brief in full, as much of the brief pertains to background information on the field of firearm and toolmark identification.  Accordingly, Mr. Joyner's motion to strike is denied.

*Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (quoting *Daubert*, 509 U.S. at 590–97). This gatekeeping analysis is "flexible," and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (citation modified). In *Daubert*, the Supreme Court provided a non-exhaustive list of five factors to assess the reliability of expert evidence, including: (1) whether the technique has been or can be tested; (2) whether the technique has a known or potential rate of error; (3) if the technique has been subject to peer review and publishing; (4) the existence of controls that govern the technique's operation; and (5) whether the technique has been generally accepted within the relevant scientific community. 509 U.S. at 593–94. In contrast, expert testimony "that rests solely on 'subjective belief or unsupported speculation' is not reliable." *Groobert v. President & Directors of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (citing *Daubert*, 509 U.S. at 590).

"The burden is on the proponent of [expert] testimony to show by a preponderance of the evidence that . . . the testimony is reliable." *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001)). Even if the proposed expert testimony is reliable, the Court may nonetheless exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Bazarian Int'l Fin. Assocs., LLC v. Desarrolos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 128 (D.D.C. 2018) (analyzing expert testimony under Rule 403).

*a.* Daubert *Factors*

Upon consideration of the *Daubert* factors, the Court finds that Mr. Van Arsdale's toolmark identification testimony satisfies the reliability standards set forth in Federal Rule of Evidence 702. Not long ago, this Court had occasion to examine the reliability of firearm and toolmark identification in *United States v. Harris*, 502 F. Supp. 3d 28 (D.D.C. 2020). There, the Court concluded that the balance of the *Daubert* factors supported the admission of firearm and toolmark identification as a discipline for expert testimony. *See Harris*, 502 F. Supp. 3d at 36–43. Mr. Joyner has not persuaded the Court that any new development since its decision in *Harris* compels a different outcome here. Accordingly, for essentially the same reasons set forth in *Harris*, the Court concludes that Mr. Van Arsdale's testimony is admissible. Below, the Court summarizes its reasoning with respect to each *Daubert* factor.

First, testability focuses on "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment. Before analyzing this factor, some background information on the methodology behind firearm and toolmark identification is necessary:

> A firearm examiner is trained to observe and classify [markings on a bullet or casing left by a firearm] into three types of characteristics during a firearm toolmark examination, which include:
>
> (1) Class characteristics: i.e., the weight or caliber of the bullet, the number of lands and grooves, the twist of the lands and grooves, and the width of the lands and grooves, that appear on all bullet casings fired from the same type of weapon and are predetermined by the gun manufacturer;
>
> (2) Individual characteristics: unique, microscopic, random imperfections in the barrel or firing mechanism created by the manufacturing process and/or damage to the gun post-manufacture, such as striated and/or impressed marks, unique to a single gun; and

(3) Subclass characteristics: characteristics that exist, for example, within a particular batch of firearms due to imperfections in the manufacturing tool that persist during the manufacture of multiple firearm components mass-produced at the same time.

*Harris*, 502 F. Supp. 3d at 34–35.

"[A] qualified examiner can determine whether two bullets were fired by the same gun by comparatively examining bullets and determining whether 'sufficient agreement' of toolmarks exist," which occurs when the class and individual characteristics sufficiently agree. *Ricks v. Pauch*, No. 17-12784, 2020 WL 1491750, at *9 (E.D. Mich. Mar. 23, 2020). The methodology of determining when "sufficient agreement" is present is detailed by the Association of Firearm and Toolmark Examiners ("AFTE") and is "the field's established standard." *United States v. Ashburn*, 88 F. Supp 3d 239, 246 (E.D.N.Y. 2015). According to the AFTE theory, "sufficient agreement" exists when the "agreement of individual characteristics is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility." The Association of Firearm and Tool Mark Examiners, *AFTE Theory of Identification as It Relates to Toolmarks*, https://temp.afte.org/about-us/what-is-afte/afte-theory-of-identification (last visited June 10, 2026).

In Mr. Joyner's view, toolmark analysis is not testable because it is "inherently subjective in nature, based entirely on the examiner's experience and expectations." Def.'s Rule 702 & *Daubert* Mot. at 5 (citation modified). Mr. Joyner's concerns are not unfounded. In *Harris*, this Court found AFTE's "sufficient agreement" standard to be "generally vague," observing that even the AFTE theory acknowledges that "the interpretation of individualization/identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience." 502 F. Supp. 3d at 41 (citation omitted); *see also United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1121 (D. Nev. 2019) ("With the AFTE method, matching two tool marks

essentially comes down to the examiner's subjective judgment based on his training, experience, and knowledge of firearms.").

Nevertheless, the Court continues to believe that the existence of subjective elements in the methodology for toolmark identification is not enough to show that the theory is not "testable." *Harris*, 502 F. Supp. 3d at 37. One way that this theory has "reasonably be[en] assessed for reliability" is through studies analyzing the factors that affect toolmark examiners' identification decisions. Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment. For example, one study used 3D image technology to assess the process used by trained firearm examiners to identify casings to a particular firearm. *See* Pierre Duez et al., *Development and Validation of a Virtual Examination Tool for Firearm Forensics*, 63 J. Forensic Sci, 1069–84 (2018). The Duez study indicated that firearm examiners from fifteen different laboratories, all conducting an independent assessment, were "mostly using the same amount and same location of microscopic marks when concluding identification." *Harris*, 502 F. Supp. 3d at 37 (citation omitted); *see also* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 41–43 (summarizing the Duez study and a second study that reached the same conclusion).

Mr. Joyner dismisses the significance of these studies. He argues that although "the studies reflect an overlap of outcomes derived from independent toolmark analyses, they do not reflect an objective threshold for how much agreement is enough, how disagreements are weighed, or when an 'identification' becomes reliable." Def.'s Reply in Supp. Rule 702 & *Daubert* Mot. at 2, ECF No. 131. However, Rule 702 does not strictly demand objective *standards*, but instead requires that "scientific, technical, or other specialized knowledge" be based on "*reliable* principles and methods." Fed. R. Evid. 702 (a), (c) (emphasis added). The AFTE theory meets this criterion. As another court put it, "the AFTE theory is testable on the

46

basis of achieving consistent and accurate results." *United States v. Otero*, 849 F. Supp. 2d 425, 433 (D.N.J. 2012). For example, validation studies have shown consistently low rates of error for firearm and toolmark identifications, including, crucially, the rates at which false positive identifications occur. *See Harris*, 502 F. Supp. 3d at 39 (noting that nineteen firearm and toolmark validation studies conducted between 1998 and 2019 reported false positive error rates of zero to 1.6%). As the Government argues, the consistently low error rates support the testability of the AFTE theory, because "[i]f qualified examiners had significantly different thresholds, the false positive and false negative error rates in these studies would be significantly higher." Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 41.

Second, the low error rates referenced above likewise support admission of Mr. Van Arsdale's testimony. Mr. Joyner asserts, however, that the true false positive rate for toolmark identifications could be higher. In support of this assertion, he relies on the 2016 President's Council of Advisors on Science and Technology Report ("PCAST Report") and a study cited therein showing a false positive rate of 2.2%, or 1 in every 46 identifications. Def.'s Rule 702 & *Daubert* Mot. at 7 (citing President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods* at 110 (2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf). Nevertheless, as the Government notes, since the PCAST Report, there have been at least seven additional studies—including two published after this Court decided *Harris*—that reported false positive error rates between 0 and 0.933%. *See* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 26–30.

Mr. Joyner also cites a recent study indicating that error rates could be "as high as 50%, that is, firearms comparisons could be as *unreliable as flipping a fair coin*." Cuellar et al.,

47

*Methodological Problems in Every Black-Box Study of Forensic Firearm Comparison*, 23 Law, Probability and Risk 1, 12 (2024).  In reaching that conclusion, the Cuellar study reviewed 28 firearms and toolmarks studies, found that alleged flaws in those studies were "so grave" as to render them invalid, and concluded that, as a result, "statements about the common origin of bullets or cartridge cases that are based on the examination of 'individual' characteristics do not have a scientific basis."  *Id.* at 1, 14.

Mr. Joyner argues that in view of the Cuellar study, this Court should reject the conclusion it reached in *Harris* regarding the admissibility of firearm and toolmark evidence.  *See* Def.'s Rule 702 & *Daubert* Mot. at 6.  However, the Court is hesitant to do so based on a single study, particularly when the Government has raised facially sensible criticisms concerning that study.  *See* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 50.  One such criticism is that the flaws reported in the Cuellar Study are generally not relevant to firearm validity studies.  To provide just one example, the Cuellar Study cited as a flaw that certain validity studies failed to calculate, prior to the start of the study, the sample size of the firearms, bullets, or cartridge casings needed to achieve the study goals.  *See id*. at 49–50.  But the Government convincingly argues that the failure to calculate a sample size at the start should not affect the ultimate results of the studies.  *Id.*  In the end, the Court agrees with the Government that the weaknesses raised in the Cuellar Study go to the weight, rather than the admissibility, of Mr. Van Arsdale's proposed testimony.  *See id.*

Finally, in analyzing the third, fourth, and fifth *Daubert* factors, Mr. Joyner raises essentially the same arguments that the Court already addressed in *Harris.*  As to the third factor—whether the AFTE methodology has been subject to peer review—although much of the literature in this discipline has been published in the AFTE Journal, which Mr. Joyner criticizes,

the Government has shown that dozens of studies have also been published in a variety of other peer-reviewed scientific journals. *See* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 33. On the other hand, the Government has not persuaded the Court that the fourth factor—the existence of controls that govern the technique's operation—weighs in favor of admissibility. As alluded to earlier, and as the Court explained in *Harris*, it is evident that the AFTE theory lacks objective standards. *See* 502 F. Supp. 3d at 41–42. Nevertheless, this factor alone is not an immediate bar to admissibility; as demonstrated above, a partially subjective methodology is not inherently unreliable. And as to the fifth factor—whether the technique has been generally accepted within the relevant scientific community—the Court reiterates its finding in *Harris* that in view of the fact that firearm and toolmark identification is practiced by accredited laboratories in the United States and throughout the world, this methodology has gained widespread acceptance within the relevant community. *See id.*; *see also* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 43–45 (collecting cases from dozens of courts around the country that have admitted firearms evidence under Rule 702).

*     *     *

Balancing all five *Daubert* factors, the Court finds that Mr. Van Arsdale's proffered toolmark identification evidence is reliable and admissible. Although one factor—the lack of objective criteria—does not favor admissibility, "the subjectivity of a methodology is not fatal under Rule 702 and *Daubert*." *Ashburn*, 88 F. Supp 3d at 246.

### b. Limiting Instruction

Lastly, Mr. Joyner argues that even if the Court finds Mr. Van Arsdale's testimony generally admissible under Rule 702, it should nevertheless limit its scope pursuant to Rule 403, which permits exclusion of otherwise probative evidence if its probative value is substantially

49

outweighed by, *inter alia*, the risk of unfair prejudice or confusing the jury.  *See* Def.'s Rule 702 & *Daubert* Mot. at 10; Fed. R. Evid. 403.  Mr. Joyner's primary concern seems to be that Mr. Van Arsdale will overstate the certainty or scientific nature of his toolmark analysis.  The Court shares this concern.  Toolmark analysis is not an exact science, and the jury should not be led to believe otherwise.

Accordingly, the Court will grant most of the limitations proposed by Mr. Joyner— which, in fact, the Government has already agreed to adopt.  *See* Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 3.  Among other things, Mr. Van Arsdale may not describe the cartridge casings recovered from the scenes of Armed Robberies 1 and 3 as being a "match," state his expert opinion with any level of statistical certainty, or render his opinion "to the exclusion of all other firearms."  *See id.*  These limitations are in accord with the Department of Justice Uniform Language for Testimony and Reports for the Forensic Firearms/Toolmarks Discipline—Pattern Matching Examination ("DOJ ULTR"), https://www.justice.gov/olp/media/1295776/dl?inline (last visited June 10, 2026).

Nevertheless, the Court denies Mr. Joyner's request to preclude Mr. Van Arsdale from testifying that the two cartridge casings "were identified as having been fired in the same firearm."  Def.'s Reply in Supp. Rule 702 & *Daubert* Mot. at 5.  The Court agrees with the Government that Mr. Joyner's proposed alternative—that Mr. Van Arsdale state merely that he "could not exclude the bullets as having been fired from the same firearm"—underrepresents the probative value of his identification conclusion.  Gov't's Opp'n to Def.'s Rule 702 & *Daubert* Mot. at 15–16.  Indeed, the DOJ ULTR permits firearms examiners to conclude that casings were fired from the same firearm when all class characteristics are in agreement, and "the quality and quantity of corresponding individual characteristics is such that the examiner would not expect to

find that same combination of individual characteristics repeated in another source and has found

insufficient disagreement of individual characteristics to conclude they originated from different

sources." DOJ ULTR at 2–3.

In sum, the Court believes that the testimony limitations as codified in the DOJ ULTR are

reasonable and should govern here. Accordingly, the Court instructs Mr. Van Arsdale to abide

by the expert testimony limitations detailed in the DOJ ULTR.

### 4.  Law Enforcement Identification (ECF No. 103)

Mr. Joyner next moves to preclude law enforcement identification testimony not based on

personal knowledge. Specifically, pursuant to Federal Rules of Evidence 701 and 602, he moves

> to preclude the Government from eliciting law enforcement testimony that (1) identifies
> Mr. Joyner as the individual depicted in surveillance video footage from offenses the
> witness did not personally observe, (2) compares surveillance footage across multiple
> charged incidents and opines that the same individual committed some or all of those
> offenses, or (3) presents "summary" or "overview" testimony synthesizing investigations
> the witness did not personally conduct.

Def.'s Mot. Preclude Law Enf't Identification Test. Not Based on Pers. Knowledge ("Def.'s

Mot. Preclude Law Enf't Test.") at 1, ECF No. 103; *see also* Fed. R. Evid. 701 (limiting opinion

testimony to, *inter alia*, that "rationally based on the witness's perception"); Fed. R. Evid. 602

(permitting testimony only upon evidence "that the witness has personal knowledge of the

matter").

There appears to be little daylight between Mr. Joyner's motion and the Government's

representations about the testimony it anticipates eliciting. Mr. Joyner does not seek to preclude

law enforcement from authenticating surveillance footage, discussing personal observations, or

testifying about the collection and processing of evidence. Def.'s Mot. Preclude Law Enf't Test.

at 3 n.1. Indeed, Mr. Joyner reiterates that, insofar as officers may testify "about relevant and

admissible facts of which they *do* have personal knowledge," he does not object. Def.'s Reply in

Supp. Mot. Preclude Law Enf't Test. at 1–2, ECF No. 135.  The Government, for its part, does not intend to elicit testimony falling into any of the three abovementioned categories from Mr. Joyner's motion.  Gov't's Opp'n to Def.'s Mot. Preclude Law Enf't Test. at 1, ECF No. 116.  As such, to the extent the Government calls on an officer to "explain what he or she personally observed and learned about the evidence based on his or her firsthand investigation of an offense, as well as the investigative actions he or she took based on that evidence," *id.* at 3, such testimony is not in dispute.  The Court therefore grants Mr. Joyner's motion to preclude the Government from eliciting law enforcement testimony relating to the three categories described in his motion.[26]

Separately, at the motions hearing, the Court became aware of a dispute concerning the Government's proposed testimony from the officer who arrested Mr. Joyner on unrelated charges on April 26, 2023.  According to the Government, this officer knew Mr. Joyner separately from this arrest because she was a corrections officer while Mr. Joyner was previously incarcerated and interacted him regularly during that time.  Hr'g Tr. at 15:8–22.  Based on the officer's prior knowledge of Mr. Joyner, the Government seeks to have her identify him in photographs that will be shown to the jury from around the time of the conduct charged in the instant case.  *Id.* at 23:4–11.  At the hearing, the Government provided the Court with several out-of-Circuit cases that it claims support admission of such identification testimony from a law enforcement officer.  *See id.* at 45:8–46:11 (citing *United States v. Dixon*, 413 F.3d 540 (6th Cir. 2005); *United States v. Anderson*, 783 F.3d 727 (8th Cir. 2015); *United States v. Farnsworth*, 729 F.2d 1158 (8th Cir.

---

[26]Mr. Joyner rejects the Government's contention that information in police reports is admissible in certain situations.  *See* Def.'s Reply in Supp. Mot. Preclude Law Enf't Test. at 3. Because the Government has not indicated that it actually *will* offer previously undisclosed law enforcement identification testimony or police reports, the Court need not address the parties' disagreements at this time.

1984); and *United States v. Louis*, 146 F.4th 1328 (11th Cir. 2025)). Mr. Joyner objects to the proposed testimony on timeliness and relevance grounds. First, the Government provided notice of this testimony on June 4, 2026, less than a month before the start of trial. *Id.* at 34:15–18. Second, Mr. Joyner argues that the jurors themselves will be able to identify him from the photographs, as he will be present in the courtroom during trial. *Id.* at 23:11–14.

At this point, the Court will excuse the Government's delay in providing notice, as the Government has represented that it disclosed the proposed testimony as soon as it learned that the officer knew Mr. Joyner separately from the April 26 arrest. *Id.* at 43:8–19. Shortly thereafter, on June 9, 2026, the Government supplemented the disclosure with additional information, including the specific photos in which the officer would identify Mr. Joyner. *Id.* at 43:20–44:7. Despite the lateness of the disclosure, the Court believes Mr. Joyner will have sufficient time to investigate and prepare for this witness. The Government has represented that the officer is expected to testify around the middle of trial, which should give Mr. Joyner a few additional weeks to prepare.

Furthermore, the Government is correct that its cited cases lend support to the admissibility of identification testimony from law enforcement officers in certain circumstances. The Eighth Circuit, for example, has explained that "under Federal Rule of Evidence 701, '[a] witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'" *Anderson*, 783 F.3d at 746 (quoting *Farnsworth*, 729 F.2d at 1160). Factors that the Eighth Circuit has found relevant to this analysis include "whether the witness was familiar with the defendant's appearance around the time that the surveillance photograph was taken, whether the defendant changed his

53

appearance between the time of the surveillance photograph and trial, and whether the surveillance photograph made it difficult for the jury to make a positive identification of the defendant." *Id.* at 747.

Here, the Government has established that the arresting officer was familiar with Mr. Joyner's appearance around the time of the charged conduct. Furthermore, Mr. Joyner's appearance at trial—in terms of both age and attire—will likely differ from his appearance in photographs from several years ago. Accordingly, contrary to Mr. Joyner's argument, it does not appear that this witness's testimony would usurp the jury's role. Nevertheless, Mr. Joyner has not had the chance to respond to the Government's cited cases in support of its proposed testimony. Moreover, the Court has not been provided with the specific photographs in which the Government seeks to have the arresting officer identify Mr. Joyner. And defense counsel indicated at the motions hearing that Mr. Joyner could be open to stipulating as to his identity in the relevant photographs, which would obviate the need for the arresting officer's testimony. *See* Hr'g Tr. at 29:23–30:2. Considering the above, the Court provisionally accepts the Government's proposed testimony as admissible, but Mr. Joyner is free to renew his objection to it closer to trial.

### 5.  Jail Calls (ECF No. 104)

Mr. Joyner moves to suppress and preclude the introduction of any recordings of his jail calls during his pretrial incarceration. *See* Def.'s Mot. Suppress & Preclude Jail Call Recordings, ECF No. 104. He notes that although the Government produced a large quantity of jail calls in discovery in September of 2025, "a significant number" were not produced in a functioning format. *Id.* at 2. On March 6, 2025, Mr. Joyner's counsel informed the Government of this issue and insisted that the Government provide corrected files promptly if the Government intended to

use those files at trial.  *Id.*  Having apparently decided that it would not introduce the jail calls in its case-in-chief, the Government did not immediately provide Mr. Joyner's counsel with the corrected files.  *See* Gov't's Resp. to Def.'s Mot. Suppress & Preclude Jail Call Recordings at 1–2, ECF No. 117.

The Government represents that although it does not plan to introduce the jail calls during its case-in-chief—and therefore does not oppose Mr. Joyner's motion in that respect—it reserves the right to use them on rebuttal or cross-examination if Mr. Joyner opens the door to such evidence.  *Id.* at 1–2.  In anticipation of the latter possibility, the Government has now reproduced the jail calls.  *Id.* at 1.  Mr. Joyner acknowledges that, to the extent he opens the door, the Government may use this evidence in cross-examination or its rebuttal.  *See* Def.'s Reply in Supp. Mot. Suppress & Preclude Jail Call Recordings at 1, ECF No. 134.  Accordingly, the Court grants Mr. Joyner's motion.  The Government is precluded from introducing jail calls that it initially produced in a non-functioning format during its case-in-chief, but it may introduce them in rebuttal or cross-examination if Mr. Joyner opens the door to this evidence.

### 6.  Certain Photographs (ECF No. 105)

Mr. Joyner moves to preclude the Government from presenting certain photographs obtained from a cell phone of his relative, N.L., who was with Mr. Joyner when he was arrested on May 2, 2023.  *See* Def.'s Mot. Exclude, Crop, or Limit Use of Certain Photographs ("Def.'s Mot. Exclude Photos"), ECF No. 105.  Mr. Joyner asks the Court to exclude photographs depicting: (1) Mr. Joyner in proximity to a gun; (2) Mr. Joyner with large amounts of cash; (3) Mr. Joyner in the presence of drugs or drug paraphernalia; and (4) photographs not visibly

showing Mr. Joyner.[27]  *See id.* at 1.  These photographs comprise Government Exhibits ("GX")

1601A–G, I, K–N, and P.  *See* Def.'s Suppl. Mot. Exclude, Crop, or Limit Use of Certain

Photographs ("Def.'s Suppl. Mot. Exclude Photos") at 3, ECF No. 144.

Mr. Joyner argues that these photographs should be excluded under Federal Rules of

Evidence 104, 401, and 402, because the Government often fails to provide a basis for relevance;

under Rule 403, because their probative value is substantially outweighed by the risk of unfair

prejudice and likelihood of misleading the jury; and under Rule 404(b), because the photos

impermissibly raise an inference of criminal propensity.  *See* Def.'s Mot. Exclude Photos at 1.

Rule 402 provides that "[i]rrelevant evidence is not admissible."  Fed. R. Evid. 402.  Evidence is

relevant if "it has any tendency to make a fact more or less probable than it would be without the

evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Further, when the relevance of evidence depends on the existence of a predicate fact, "proof

must be introduced sufficient to support a finding that the fact does exist."  Fed. R. Evid. 104(b).

Finally, as explained previously, the admissibility of Rule 404(b) evidence is reviewed under a

two-step analysis: first, the evidence must be probative of some material issue other than

character, and second, the evidence must not be unfairly prejudicial under Rule 403.  *See* Fed. R.

Evid. 404(b), 403.  In the sections that follow, the Court reviews the admissibility of the four

categories of photographs challenged by Mr. Joyner.

### a.  Photographs Depicting Mr. Joyner in Proximity to a Gun

Five of the photographs Mr. Joyner challenges depict him with firearms.  GX-1601A,

dated April 20, 2023, portrays him sitting inside a Honda HR-V, holding a gun in his left hand

---

[27] Mr. Joyner initially also requested that the Government redact photos displaying profane or potentially gang-related hand signs.  *See* Def.'s Mot. Exclude Photos at 1.  However, the Government did not ultimately notice any exhibits depicting such hand signs.

and a wad of cash in his right hand. GX-1061B–E, which were taken in January of 2023, show either a two-tone gun or Mr. Joyner holding a two-tone gun. The Court already discussed these photographs—the April 20 Photo and the Two-Tone Gun Photos—in the context of the Government's Rule 404(b) motion. *See supra* pp. 10–18; Gov't's Suppl. Mot. at 2–3. The Government repeats its argument here that these photos are admissible as "other crimes" evidence under Rule 404(b) to show that Mr. Joyner's possession of a firearm during the charged offenses was knowing. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 7–8, ECF No. 113. As the Court explained above, however, showing these photos for that purpose would encourage jurors to draw the impermissible inference that because Mr. Joyner used guns on other occasions, he likely used them during the charged offenses, too. *See supra* pp. 10–18. Still, the Government may introduce these photographs if Mr. Joyner opens the door to this evidence by arguing that he could not have committed the charged offenses because he was not familiar with firearms or did not have access to firearms. The Court will defer consideration until trial of whether the photos should nevertheless be excluded as unfairly prejudicial under Rule 403.

### b. Photographs Depicting Mr. Joyner with Large Amounts of Cash

Mr. Joyner also seeks to exclude six photographs—GX-1601A, F–G, and K–N–that show him with large amounts of cash as irrelevant and unfairly prejudicial under Rule 403. *See* Def.'s Mot. Exclude Photos at 3. GX-1601A, F–G, and L–N depict Mr. Joyner with cash inside a Honda HR-V, and GX-1601K shows him sitting on a couch and holding a wad of cash. As noted, GX-1601A is not admissible to prove Mr. Joyner's knowing possession of a firearm. Still, the Government argues that GX-1601A and other photos are otherwise admissible under Rule 404(b) to prove Mr. Joyner's identity because they depict Mr. Joyner wearing clothes and accessories similar to those worn by the perpetrator of several of the charged offenses. Gov't's

Opp'n to Def.'s Mot. Exclude Photos at 7.  The Government further argues that the photos showing him inside the HR-V help prove that he committed Armed Carjacking 1, during which a similar HR-V was stolen.  *Id.*  As explained below, although the photos are relevant, the cash pictured in them is not.

At the outset, the Court addresses—and quickly dismisses—the Government's argument that the photos depicting Mr. Joyner inside an HR-V are "intrinsic" evidence of Armed Carjacking 1 and thus admissible regardless of whether Rule 404(b) is satisfied.  *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 7.  Under D.C. Circuit precedent, intrinsic evidence consists of evidence of (1) "an act that is part of the charged offense," or (2) "uncharged acts performed contemporaneously with the charged crime" that "facilitate the commission of the charged crime."  *Bowie*, 232 F.3d at 929.  Here, GX-1601A, F–G, and L–N depict Mr. Joyner with cash inside an HR-V, which, according to the Government, belongs to the victim of Armed Carjacking 1.  Still, according to their metadata, these photographs were all taken a week *after* the HR-V was carjacked.  The Court therefore does not understand how these photos depict "an act that is part of the charged offense."  Some courts have held that the crime of carjacking can continue past the initial dispossession of the vehicle through the perpetrator's escape from pursuit.  *See United States v. Villalobos-Macias*, 280 F. Supp. 3d 1211, 1217–18 (D.N.M. 2017) (collecting cases).  But these photos depict Mr. Joyner a week after the alleged carjacking—presumably long after he "reached a place of temporal safety" ending his flight.  *Id.* at 1218.  And for the same reason, these photos cannot depict an uncharged act performed contemporaneously with the carjacking.

Even if not intrinsic evidence, though, the photos of Mr. Joyner inside the HR-V can come in under Rule 404(b) as evidence that tends to prove Mr. Joyner's "identity" as the

perpetrator of Armed Carjacking 1 and other offenses. Fed. R. Evid. 404(b)(2). His identity as the perpetrator is discernable in at least two ways. First, a few of the photos show Mr. Joyner wearing distinctive clothing and accessories also worn by the perpetrator of some of the charged offenses. Specifically, GX-1601G shows him wearing gray New Balance sneakers and a necklace with a double "S" medallion, and GX-1601N shows him wearing the same necklace. As previously explained, *see supra* pp. 19, surveillance footage captured the suspect of Armed Carjacking 1 wearing a similar necklace shortly after the crime and the perpetrator of Armed Carjacking 1 and Armed Robberies 2–3 wearing similar shoes. GX-1601G and N are admissible to help prove Mr. Joyner's identity as the perpetrator of those offenses.

Second, GX1601A, F–G, and L–N depict Mr. Joyner inside a Honda HR-V, which the Government contends is the same vehicle that was stolen in Armed Carjacking 1. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 7. Of course, these photos are relevant only if the Government can prove that the two vehicles are indeed the same. *See* Fed. R. Evid. 104(b). The Government claims this is the case because a Virginia registration sticker depicted in one of the photos shows that the HR-V inside of which Mr. Joyner is pictured belongs to the victim of Armed Carjacking 1. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 7. Mr. Joyner has not addressed this claim. But provided that the Government can show through the registration sticker or otherwise that these photos depict the HR-V that was stolen in Armed Carjacking 1, the photos will be deemed admissible under this second theory.[28]

In sum, subject to the constraints described above, the photos depicting Mr. Joyner with cash inside a Honda HR-V—GX-1601A, F–G, and L–N—are admissible to prove his identity

---

[28] Unless the Government has done so already, the Court orders it to describe to Mr. Joyner any other proof it has that the HR-V in the photos belongs to the victim of Armed Carjacking 1.

under Rule 404(b). As for the final photo—GX-1601K, which shows him sitting on a couch and holding a wad of cash—this photo is also relevant because it shows Mr. Joyner wearing the double "S" necklace.

Nevertheless, the Court agrees with Mr. Joyner that showing the jury photos of him flaunting piles of cash will "unfairly suggest, without evidentiary support, that [he] committed a crime and benefitted financially." Def.'s Mot. Exclude Photos at 3 (quoting *United States v. Lackey*, No. 17-cr-269, 2019 WL 6464656, at *3 (M.D. Pa. Dec. 2, 2019)). Citing a Sixth Circuit case, the Government counters that "unfair prejudice does not outweigh probative value" for photos depicting wealth if "(1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity." Gov't's Opp'n to Def.'s Mot. Exclude Photos at 8–9 (quoting *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002)). But *Jackson-Randolph* is inapposite. In that case, the Sixth Circuit held that evidence of the defendant's lavish lifestyle was admissible "to demonstrate, not just motive, but also a likelihood that the extra wealth came from illegitimate sources and to support an inference that the defendant committed the alleged crime." 282 F.3d at 378. The Government is not offering the photos at issue here to prove that the cash pictured in them was obtained through illegal activity. By its own telling, it is offering them to prove that Mr. Joyner committed Armed Carjacking 1 and other offenses because he wore similar clothes and used a similar car on other occasions. As the Government conceded at the motions hearing, the cash in these photos is irrelevant to those purposes. *See* Hr'g Tr. at 13:12–15 ("[W]e're not introducing photographs of the cash specifically for cash. We are introducing photographs of the defendant as he is dressed and there just happens to be cash

60

there."). Accordingly, the Court orders the Government to redact or crop the piles of cash visible in the photos.[29]

### c. *Photographs Depicting Mr. Joyner in the Presence of Drugs or Drug Paraphernalia*

The Government has already agreed to redact drugs or drug paraphernalia from its proffered photos. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 10. Nevertheless, as Mr. Joyner notes, several photos in the Government's exhibits still appear to depict drugs or drug use. *See* Def.'s Suppl. Mot. Exclude Photos at 3. The Government is ordered to make necessary redactions, including the bag in the center console shown in GX-1601A, L, and N; the materials in the passenger's hand in GX-1601G; and the substance in the ash tray in GX-1601I.

### d. *Photos Not Visibly Showing Mr. Joyner*

Finally, Mr. Joyner seeks exclusion of two photos that do not depict him. First, one of the Two-Tone Gun photos—GX-1601D—simply shows the gun on the floor. *See* Def.'s Mot. Exclude Photos at 8. As noted, the Two-Tone Gun photos will be admissible only if Mr. Joyner opens the door to this evidence by raising a lack of possession defense. If the Government moves to admit GX-1601D in rebuttal or cross-examination, Mr. Joyner is free to renew his motion to exclude this photograph.

---

[29] At the motions hearing, the Government suggested that even though it is not offering the photographs to prove that the cash depicted in them comes from a particular robbed store, it can nevertheless show the jury the cash because, according to case law, "that can go to whether or not the defendant is someone who had robbed, like, 7-11s or the gas stations previously." Hr'g Tr. at 13:22–14:2. This case law appears to include *Jackson-Randolph*. In its opposition brief, the Government argued it could fulfill the three conditions set forth in *Jackson-Randolph* because: first, it will show at trial that Mr. Joyner committed armed robberies around the time the photos were taken; second, it will subpoena his tax records for 2023 and show his income during this period; and third, it will show that photos of Mr. Joyner holding large sums of cash were taken immediately following the robberies. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 8–9. However, as of the filing of Mr. Joyner's reply to the instant motion, the Government had not disclosed the tax records. If the Government intended to subpoena Mr. Joyner's tax records, the Court does not understand why it waited until the eve of trial to inform him of this.

Second, Mr. Joyner opposes introduction of GX-1601P, which shows the vehicle identification number ("VIN") of a Kia Optima. *See* Def.'s Mot. Exclude Photos at 9. This photo is admissible because it tends to connect Mr. Joyner to Armed Robbery 5. As the Government explains, surveillance footage from Armed Robbery 5 shows the perpetrator running to and from a Kia Optima parked nearby. *See* Gov't's Opp'n to Def.'s Mot. Exclude Photos at 12. The Kia Optima was later recovered near where Mr. Joyner was arrested. *Id.* Mr. Joyner's fingerprints were found on the Kia Optima. *Id.* In that context, a photo of the Kia Optima recovered from the phone of Mr. Joyner's relative serves to establish further ties between the vehicle and Mr. Joyner. Thus, the Court disagrees with Mr. Joyner that the Government has failed to explain how a photo of a Kia Optima on someone else's phone ties Mr. Joyner to that vehicle. *See* Def.'s Reply in Supp. Mot. Exclude Photos at 5, ECF No. 136.

### 7. Testimony of Officer Jermone McClinton (ECF No. 106)

Mr. Joyner moves *in limine* to exclude or limit the testimony of Metropolitan Police Department Officer Jermone McClinton under Federal Rules of Evidence 702 and 403. *See* Def.'s Mot. Limit Test. of Officer Jermone McClinton ("Def.'s Mot. Limit McClinton Test."), ECF No. 106. The Government provided timely notice of its intent to elicit expert testimony from Officer McClinton regarding a U.S. Fire Arms Manufacturing Co. Zip .22 LR firearm that law enforcement found beside Mr. Joyner in the vehicle in which he was arrested for the instant, charged conduct on May 2, 2023. *See* Gov't's Not. of Expert Test. in the Field of Firearms Seized in the District of Columbia ("McClinton Not."), ECF No. 87. As set forth below, the Court grants this motion in part and denies it in part.

The Government alleges that during the last six robberies (Armed Robberies 5–10) charged in the Superseding Indictment, which took place in the three days before Mr. Joyner was

arrested, Mr. Joyner brandished what appears to be the same firearm, based on CCTV footage from some of the targeted stores.  *See* Gov't's Opp'n to Def.'s Mot. Limit McClinton Test., ECF No. 118.  The Government seeks to have Officer McClinton testify, *inter alia*, that he is an officer in the Department of Forensic Sciences National Integrated Ballistic Information Network ("NIBIN") Unit, where he test-fires guns; that he test-fired the U.S. Fire Arms Manufacturing Co. Zip .22 LR recovered in this case; that he "has test-fired over 10,000 firearms that law enforcement has seized in the District of Columbia, Maryland, and Virginia"; that out of all the firearms he hast test-fired, he "has never received and/or test-fired another U.S. Fire Arms Manufacturing Co. Zip .22 LR" or a firearm that "looks like the firearm . . . recovered in this case," whose "shape and appearance . . . are unique."  McClinton Not. at 2.

Mr. Joyner argues that this testimony does not satisfy the standards set forth in Rule 702, which permits a witness who is "an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the proponent demonstrates" a likelihood that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In Mr. Joyner's view, the Government fails to establish that Officer McClinton has employed "reliable principles and methods" and applied them reliably to the facts of the case in arriving at his uniqueness opinion regarding the U.S. Fire Arms Manufacturing Co. Zip .22 LR.  Def.'s Mot. Limit McClinton Test. at 3–4.  Accordingly, Mr. Joyner urges the Court to find Officer McClinton's testimony inadmissible under the *Daubert* factors.  *See id.* at 2–3.  Again, these factors include "whether the theory or technique in question

can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community."  509 U.S. at 580.

The Court concludes that Officer McClinton's proposed testimony is admissible.  As a preliminary matter, "personal experience can be a reliable and valid basis for expert testimony." *Groobert*, 219 F. Supp. 2d at 7.  Furthermore, the Court need not find that the proffered testimony conforms to all *Daubert* factors to deem it sufficiently reliable for admission.  As the Supreme Court has explained, "the Rule 702 inquiry is a flexible one," and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (citation modified).  "This is particularly true with non-scientific testimony, where the *Daubert* factors may not apply because the issue is 'highly particular and has not attracted scientific scrutiny.'" *Groobert*, 219 F. Supp. 2d at 7 (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996)).  At the same time, Rule 702 cautions that "an expert's testimony should [not] be treated more permissibly simply because it is outside the realm of science."  Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment; *see also United States v. Stagliano*, 729 F. Supp. 2d 222, 225 (D.D.C. 2010) ("Of course, the Daubert framework is not limited to scientific testimony.").

The Government offers Officer McClinton's testimony as an "expert witness in the field of make, model, and caliber of firearms seized in the District of Columbia, Maryland, and Virginia."  McClinton Not. at 1.  "The party wishing to use an expert witness must first establish the witness's 'knowledge, skill, experience, training, or education.'" *United States v. Smith*, 640

F.3d 358, 365 (D.C. Cir. 2011) (quoting Fed. R. Evid. 702)).  The Government has done so here.  It explains that as part of his job, Officer McClinton receives firearms that are seized in the local area; notates descriptive information about them, including their make, model, and caliber; and test-fires them so that a separate technician can upload images of their test-fired cartridge casings into the NIBIN system.  McClinton Notice at 1.  Officer McClinton has served in this role for over twenty years and, in doing so, has test-fired over 10,000 firearms.  *Id.* at 2.  Officer McClinton's significant experience easily qualifies him as an expert witness.  *Cf. Smith*, 640 F.3d at 366 (opining that an FBI agent "would have qualified as an expert and testified about . . . slang conversations . . . based on his 21 years with the FBI and 17 years investigating drug crimes, hundreds of drug investigations, and thousands of hours listening to wiretapped conversations between drug dealers").

Although Mr. Joyner does not directly dispute Officer McClinton's qualifications, he challenges the reliability of the "principles and methods" he employed to arrive at his conclusions concerning the U.S. Fire Arms Manufacturing Co. Zip .22 LR. Fed. R. Evid. 702(c)–(d); Def.'s Mot. Limit McClinton Test. at 3–4.  As noted, however, the Government has established that Officer McClinton's specialized knowledge derives from his professional experience notating information about thousands of firearms seized in the area—including make, model, and caliber—and test-firing them.  It is reasonable to suppose that in doing so, he has become very familiar with which firearms are common to the area and which are not.  The Court believes that he is entitled to rely on this specialized knowledge to formulate an opinion regarding the uniqueness of the U.S. Fire Arms Manufacturing Co. Zip .22 LR.[30]  *Cf. United*

---

[30] Mr. Joyner also faults the Government's notice for not explaining exactly how Officer McClinton's experience allowed him to reach the conclusion that the U.S. Fire Arms Manufacturing Co. Zip .22 LR is rare in the area.  For this reason, Mr. Joyner contends that an

*States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010) ("[A]n individual testifying about the operations of a drug conspiracy based on previous experiences with other drug conspiracies has 'specialized' knowledge and . . . should be admitted as an expert."). Officer McClinton need not, as Mr. Joyner suggests, have consulted a specific "database" or "statistical framework" for his opinion to be deemed reliable. Def.'s Mot. Limit McClinton Test. at 3; *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data.").

Additionally, at this moment, the Court believes that the probative value of Officer McClinton's testimony is not "substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The probative value is patently clear. Based on CCTV footage, the perpetrator of Armed Robberies 5–10 robbed the stores with a firearm of the same size, color, and shape—including the distinctive curvy magazine—as the U.S. Fire Arms Manufacturing Co. Zip .22 LR seized by law enforcement at the time of Mr. Joyner's arrest. If the jury believes Officer McClinton's testimony that, in his time examining firearms that were seized locally, he has never received another firearm quite like the U.S. Fire Arms

---

evidentiary hearing is needed to determine whether Officer McClinton will provide a sufficiently reliable basis for this opinion. *See* Def.'s Req. for Evid. H'rg Regarding Jermone McClinton's Test., ECF No. 143. But, again, it seems clear to the Court that Officer McClinton would have relied on his deep familiarity with the sorts of handguns seized in the region—derived, at minimum, from his professional experience notating information about such handguns—to reach a conclusion regarding the uniqueness of the U.S. Fire Arms Manufacturing Co. Zip .22 LR. And the Government confirmed at the motions hearing that Officer McClinton's opinion will be based on his recollection of the thousands of handguns he has examined and test-fired in his professional capacity. *See* Hr'g Tr. at 51:23–52:24. Accordingly, the Court denies Mr. Joyner's request for an evidentiary hearing.

Manufacturing Co. Zip .22 LR, the likelihood increases that the firearm seized upon Mr. Joyner's arrest is the same as the one used in the commission of Armed Robberies 5–10.[31]

Mr. Joyner's principal argument as to prejudice is that the Government is offering Officer McClinton as both a fact and expert witness, *see* McClinton Notice at 4 ("Much of [Officer McClinton's] testimony will be 'fact' testimony and will not fall within the ambit of 'expert' testimony."), and "the jury is likely to be confused as to what portion of Officer McClinton's testimony comprises factual observations and what portion comprises expert conclusions." *See* Def.'s Reply in Supp. Mot. Limit McClinton Test. at 3, ECF No. 130. Mr. Joyner is correct that offering a "'two-hatted' witness providing closely related lay and expert opinion testimony" presents the risk of jury confusion as to whether an opinion is based on the witness's personal or specialized knowledge. *United States v. Williams*, 827 F.3d 1134, 1160 (D.C. Cir. 2016). Nevertheless, "[u]nder the Federal Rules of Evidence, the same witness should be allowed to 'provide both lay and expert testimony in a single case'"—a position that is "supported by authority within and outside of this jurisdiction." *United States v. Eiland*, No. 4-cr-379, 2006 WL 2844921, at *2 (D.D.C. Oct. 2, 2006) (quoting Fed. R. Evid. 701 Advisory Committee's Note to 2000 Amendment) (collecting cases). Specifically, Rule 701 allows a lay witness to provide an opinion that is "rationally based on the witness's perception," and Rule 702 allows an expert witness to provide an opinion that is based on "the expert's scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(a), 702(a).

---

[31] Mr. Joyner argues that Officer McClinton's testimony is not necessary because the jury itself can compare photos of the seized U.S. Fire Arms Manufacturing Co. Zip .22 LR with CCTV footage of the firearm used in Armed Robberies 5–10. Def.'s Mot. Limit McClinton Test. at 6. However, Officer McClinton's expert testimony is not being offered to help the jury determine whether, *based on such a visual comparison*, the two firearms are indeed the same. Rather, it is being offered to help the jury understand that a U.S. Fire Arms Manufacturing Co. Zip .22 LR is not a type of firearm that is common in the area.

In *Williams*, the D.C. Circuit found that the risk of jury confusion was exacerbated when an FBI agent was permitted to provide, on the one hand, lay opinion testimony interpreting recorded conversations between alleged co-conspirators in a cocaine-distribution scheme that he had listened to during the FBI's investigation, and on the other, expert opinion testimony on "the interpretation of words and phrases used by drug traffickers." 827 F.3d 1134, 1157 (D.C. Cir. 2016) (citation omitted). However, the D.C. Circuit's finding was based not on the admission of both forms of testimony *per se*, but rather on flaws in the presentation of the testimony, including the lack of an "adequate explanation of the bases for [the agent's] lay opinions to distinguish them from his expert opinions." *Id.* at 1160. Thus, rather than exclude Officer McClinton's testimony, the Court will instead instruct Officer McClinton to be vigilant about identifying the bases for his opinions and clear about whether his opinions are based on his personal knowledge or his professional experience.

Finally, Mr. Joyner requests that the Court preclude Officer McClinton from using terms like "rare" or "unique" to describe the U.S. Fire Arms Manufacturing Co. Zip .22 LR. In his view, the Government has "concede[d] that any marginal probative value from Officer McClinton's testimony is not dependent on the use of words like 'rare' or 'unique' to describe the firearm." Def.'s Reply in Supp. Mot. Limit McClinton Test. at 4. The Court agrees with Mr. Joyner that it is different for a NIBIN officer to state that he has never seen a particular handgun in his decades-long career and the same officer to call that handgun "unique." The former leaves no doubt as to the basis for the officer's belief—his experience handling firearms as an officer in the NIBIN unit —while the latter might suggest to the jury that the handgun is one of a kind as an objective matter. *See* Unique, Oxford English Dictionary (2d ed. 1989) (defining "unique" as "[o]f which there is only one"). Nevertheless, provided that Officer McClinton explains to the

68

jury that the basis for his opinion derives from his own experience, the Court does not see a substantive difference between stating that he has never seen a particular handgun and stating that the handgun is "rare." Thus, although the Court will preclude Officer McClinton from using the term "unique," he is free to describe the U.S. Fire Arms Manufacturing Co. Zip .22 LR as "rare," "unusual," or other similar terms if he also notes that his opinion is based strictly on his experience dealing with handguns in the course of his employment.

### 8. Certain Expert Testimony (ECF No. 107)

In an omnibus motion, Mr. Joyner moves *in limine* to limit and, where appropriate, exclude certain testimony from several of the Government's proposed expert witnesses. *See* Def.'s Omnibus Mot. *in Limine* Limit & Excl. Certain Expert Test. ("Def.'s Omnibus Mot."), ECF No. 107. Mr. Joyner does not challenge this expert testimony as inadmissible under Rule 702. Instead, he requests that the Court "limit the Government's expert testimony under Rule 403 to prevent misleading or confusing the jury, including by (1) prohibiting language that overstates the reliability of the experts' methods or findings, such as describing results with certainty; (2) preventing blurred lines between expert and fact testimony; (3) excluding cumulative expert testimony; and (4) precluding testimony that exceeds the scope of disclosed opinions, relies on undisclosed methodologies or data, or introduces new conclusions at trial." *Id.* at 3. The Court addresses Mr. Joyner's motion with respect to several of the Government's proposed experts. As set forth below, the Court grants Mr. Joyner's motion in part and denies it in part.

### a. Latent Print Examiners

The Government has noticed testimony from three latent fingerprint examiners who are expected to testify, *inter alia*, to the similarities between Mr. Joyner's prints and prints recovered

from the Government's evidence. *See* Def.'s Omnibus Mot. at 3. Mr. Joyner argues that the experts should be precluded from identifying him as the source of prints or using language such as "match," degree of statistical certainty," and "to the exclusion of others." *Id.* at 3–4. The Government, for its part, affirms that it will follow the guidance set forth in the relevant DOJ ULTR, including by not eliciting testimony that two prints originated from the same source with absolute accuracy or using terms like "reasonable degree of scientific certainty." *See* Gov't's Opp'n to Def.'s Omnibus Mot. at 9, ECF No. 119. Also consistent with the DOJ ULTR, however, the Government does intend to elicit testimony about a "source identification." *Id.* As noted previously, the Court believes that the testimony limitations codified in the DOJ ULTR should govern the testimony proffered by the Government's experts. Accordingly, the Court instructs the Government's latent print examiners to abide by the expert testimony limitations detailed in the DOJ ULTR.

### b. *Interstate Nexus Expert*

The Government has also noticed an expert to testify at trial that the firearm, cartridges, and casings recovered during the investigation are "firearms" and "ammunition" as defined by federal law and traveled in interstate commerce. *See* Def.'s Omnibus Mot. at 4. The parties largely agree on the limitations that should govern the interstate nexus expert's testimony. *See* Gov't's Opp'n to Def.'s Omnibus Mot. at 11 (agreeing that the expert's testimony "should be limited to his disclosed opinions in his report and timely filed expert notice"). To the extent the parties fail to agree to a stipulation on the intestate nexus element, the Court instructs the Government's interstate nexus expert to limit his testimony to his disclosed report and timely filed expert notice.

70

### c. Digital Forensics

The Government has further provided notice that digital forensics experts will testify about digital data extractions performed on cell phones seized during the investigation. *See* Def.'s Omnibus Mot. at 5. Again, the parties largely agree on the limitations that should govern the experts' testimony. The Government notes that the experts will not offer an "opinion about [Mr. Joyner's] connection or nexus to the cellphones from which they extracted data" or an "interpretation of the factual significance of the data." Gov't's Opp'n to Def.'s Omnibus Mot. at 13. The experts will "simply explain[ ] the hardware and software that they used to extract data and showing the jury what the data . . . shows." *Id.* The Court instructs the digital forensics experts to abide by these limitations.

### d. Electronic Tracking Technology

Finally, the Government noticed John Wood, a Senior Regional Coordinator at 3Si Security System, as an expert in electronic tracking devices to testify about a 3Si GPS tracker recovered after Armed Robbery 5. *See* Notice of Expert Test. ("Wood Notice"), ECF No. 90. The GPS tracker was included in a bundle of money that was robbed from a 7-Eleven during Armed Robbery 5. *See* Gov't's Opp'n to Def.'s Omnibus Mot. at 14. The Government's notice states that Mr. Wood is expected to testify, among other things, regarding "the activation of 3Si's GPS tracking device, the functionality of the GPS tracking device, the GPS tracking technology, and the longitudinal and latitudinal data the GPS tracking device provides to assist law enforcement." Wood Notice at 3. Mr. Joyner does not appear to challenge this testimony. However, he argues that Mr. Wood should be precluded from testifying regarding "the specific data reviewed by law enforcement regarding the GPS tracker" recovered after Armed Robbery 5 or "the evidentiary value of that data in the investigation of the armed robbery." Def.'s Omnibus

71

Mot. at 6–7 (quoting Wood Notice at 3).  Mr. Joyner argues that the latter is fact testimony falling outside the scope of Rule 702, and to admit it would "raise[ ] the risk the jury will impermissibly lend expert credibility" to issues of fact.  Def.'s Omnibus Mot. at 7.

The Court does not find Mr. Wood's proposed testimony unfairly prejudicial.  As an initial matter, the Court is not convinced that testimony about specific data concerning the GPS tracker from Armed Robbery 5 falls outside the scope of Rule 702.  As the Government notes, Rule 702 allows a witness who is qualified as an expert by "training" to testify if his "specialized knowledge will help the trier of fact to understand the evidence."  Fed. R. Evid. 702(a).  The Government explains that in his role as Senior Regional Coordinator, Mr. Wood "assists law enforcement agencies with . . . the monitoring, tracking, and deployment of electronic tracking devices."  Wood Notice at 2.  After Mr. Joyner filed the instant motion, the Government filed a supplemental notice for Mr. Wood.  *See* Suppl. Wood Notice, ECF No. 111.  In that notice, the Government explains that Mr. Wood's testimony regarding the "evidentiary value" of the data recovered from the GPS tracker at issue will include "describ[ing] the particular travel path of the 3Si tracking device from the 7-Eleven to its ultimate resting location, from which law enforcement recovered the device."  *Id.* at 3.  The Federal Rules of Evidence explain that "[l]ay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field."  Fed. R. Evid. 701 Advisory Committee's Note to 2000 Amendment (citation modified).  Here, interpretation of the data specific to the GPS tracker from Armed Robbery 5 could very well require "reasoning which can be mastered only by specialists in the field."

Even if such testimony is not within Rule 702's scope, the Court believes that Mr. Wood would be able to testify as both an expert (with respect to the method of GPS data extraction) and

72

a lay witness (with respect to the specific location of the GPS tracker at issue) with little risk of prejudice to Mr. Joyner.  In *United States v. Thompson*, for example, the Third Circuit affirmed the trial court's decision to allow a 3Si executive to testify as a lay witness regarding "the data generated by [a GPS] device" and to "explain[ ] how the responding police officers were able to track and apprehend [the defendant] using the GPS system."  *United States v. Thompson*, 393 F. App'x 852, 858 (3d Cir. 2010).  There, the executive "was responsible for customer service and sales," and, by virtue of "conducting live demonstrations of the reliability of the GPS devices" to prospective clients, he was afforded a "basis for attesting to the reliability of the system."  *Id.* Here, Mr. Wood directly assists law enforcement with "the monitoring, tracking, and deployment of electronic tracking devices."  Wood Notice at 2.  To the extent that his interpretation of data from the GPS tracker at issue is not based on specialized knowledge, the Court finds that— provided that the "factual predicate of the testimony" is established at trial—this interpretation would be "rationally based on [Mr. Wood's] perception."  *Thompson*, 393 F. App'x at 858–59 (citation modified).

*    *    *

After Mr. Joyner filed the present motion, the Government filed a supplemental notice providing further information about testimony to be offered by three experts.  First, in March of 2026, it noticed electronic tracking technology expert John Wood, *see* Wood Notice, and on May 25, 2026, it supplemented this notice, *see* Suppl. Wood Notice, ECF No. 116.  Second, in June of 2025, it noticed latent print expert Keturah Wallace, *see* Notice of Expert Test. ("Wallace Notice"), ECF No. 66, and on May 27, 2026, it supplemented this notice, *see* Suppl. Wallace Notice, ECF No. 123.  Third, in June of 2025, it noticed NIBIN officer Jermone McClinton, *see* McClinton Notice, and on June 1, 2026, it supplemented this notice, *see* Suppl. McClinton

73

Notice, ECF No. 124.  However, the Court's scheduling order required the Government to "file expert witness notices (or supplement prior notices)" by April 6, 2026.  *See* Second Revised Pretrial Order, ECF No. 80.  Mr. Joyner thus moves to preclude late-noticed testimony from these experts.  *See* Def.'s Mot. Preclude Late-Noticed Expert Test., ECF No. 125.

Under Federal Rule of Criminal Procedure 16(a)(1)(G), the time for the Government to make its expert disclosures "must be sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence."  Fed. R. Crim. P. 16(a)(1)(G)(ii).  Disclosures must contain, among other things, "a complete statement of all opinions that the government will elicit from the witness" and "the bases and reasons for them."  Fed. R. Crim. P. 16(a)(1)(G)(iii).  The purpose of Rule 16's notice requirements is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16 Advisory Committee's Note to 1993 Amendment.  If a party fails to comply with the Rule, a court is authorized to impose sanctions, up to and including "prohibit[ing] that party from introducing the undisclosed evidence."  Fed. R. Crim. P. 16(d)(2)(C).

Although the Government's supplements here are untimely, the Court does not believe that exclusion of supplemental expert testimony is warranted.  For one, with respect to the Wood and McClinton Notices, the Government's supplements provide additional information within the scope of the opinions provided in the initial disclosures, as opposed to entirely novel opinions.  As noted above, the Supplemental Wood Notice described in further detail Mr. Wood's testimony regarding the "evidentiary value" of data recovered from a GPS tracker.  *See* Suppl. Wood Notice.  As for Officer McClinton, the Government's initial disclosure noted that he would testify that a firearm's "shape and appearance" were distinctive.  *See* McClinton

74

Notice.  The supplement clarifies which specific aspects of the firearm will be described as such.

*See* Supplemental McClinton Notice.  With respect to Ms. Wallace, in contrast, the

Government's supplemental notice includes one opinion not referenced initially: that Ms.

Wallace will testify that the latent print impression of B.H.—the unindicted co-conspirator whom

the Government claims fraudulently used a robbery victim's credit card—was found on the

exterior of the Honda HR-V allegedly stolen in Armed Carjacking 1.  *Compare* Wallace Notice

at 3, *with* Suppl. Wallace Not. at 3.  But although absent from the initial notice, this opinion was

included in a report attached to the notice in June of 2025.  *See* Gov't's Opp'n to Def.'s Mot.

Preclude Late-Noticed Expert Test. at 7, ECF No. 146.

   To be clear, the Court does not mean to suggest that the Government's supplements were

superfluous because the initial disclosures satisfied Rule 16's "complete statement" requirement.

Nevertheless, the Court is reluctant to suppress the late-noticed supplemental testimony because

there is no indication that the Government has acted in bad faith.  *Cf. United States v. Marshall*,

132 F.3d 63, 70 (D.C. Cir. 1998) ("[A]lthough Rule 16 gives trial judges the option of

suppressing evidence as a result of the government's discovery violations, such a severe sanction

would seldom be appropriate where—as here—the trial court finds that the government's

violation did not result from its bad faith . . . .").  The Government seems to have filed some of

the supplements in response to concerns identified by Mr. Joyner in his motions *in limine*.  And

the additional information provided appears to assist the Defense in its preparation for the cross-

examination of these witnesses rather than hinder it.  Furthermore, the supplements were based

either on opinions or information that had been timely disclosed.  *Cf. United States v. Eby*, No.

24-3716, 2025 WL 3688925, at *5 (6th Cir. Dec. 19, 2025) (declining to find prejudice from the

prosecution's untimely disclosure of two expert reports where the defendant "had access to the

information forming the basis of these reports for eleven months prior to trial"). And given that the supplements were filed a month before trial and Mr. Joyner identifies no specific undue prejudice stemming from this timeline, the Court believes that Mr. Joyner will have sufficient time before trial to digest the supplemental information and prepare for the cross-examination of the witnesses.

### 9.  DNA Evidence (ECF No. 108)

Lastly, Mr. Joyner moves to preclude the Government from eliciting certain testimony related to DNA evidence. *See* Def.'s Mot. Limit Test. on DNA Evid. ("Def.'s Mot. Limit DNA Evid."), ECF No. 108. The Government timely noticed Forensic DNA Examiner Amanda Bakker, who works in the FBI Laboratory DNA Casework Unit in Quantico, to testify regarding various DNA samples that were recovered from some of the robbed convenience stores and vehicles in this case and subsequently tested to determine the likelihood that Mr. Joyner's DNA profile matched the samples. *See id.* at Ex. A ("Bakker Notice"); Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 13–15, ECF No. 121. First, Mr. Joyner urges the Court to exclude the results from four samples under Rule 403, arguing that their limited probative value is "substantially outweighed" by the danger of jury confusion and overvaluation. Fed. R. Evid. 403; Def.'s Reply in Supp. Mot. Limit DNA Evid. at 1, ECF No. 127. Second, he moves to preclude Examiner Bakker from "testifying that any likelihood ratio constitutes an absolute identification, a source attribution, or proof that Mr. Joyner's DNA was present on an evidentiary item with certainty." Def.'s Mot. Limit DNA Evid. at 1. Third, he moves to exclude a report from the FBI Combined DNA Index System ("CODIS") database ("CODIS Report") that associates Mr. Joyner with a 2017 robbery investigation. *Id.* As explained below, the Court grants Mr. Joyner's motion in part and denies it in part.

76

The four DNA samples whose results Mr. Joyner seeks to exclude were recovered from: (1) the front-passenger area of a GMC Yukon used in Armed Robberies 7–10 ("Item 4"); a till under a counter of the Falcon Fuel robbed in Armed Robbery 1 ("Item 44"); sunglasses from the Honda HR-V stolen in Armed Carjacking 1 ("Item 56(1)"); and the front-passenger area of that HR-V ("Item 69"). Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 13–14. These samples were imported into a probabilistic genotyping software, STRmix, which calculated the statistical probability that Mr. Joyner's DNA contributed to the DNA profile of the samples ("inclusion") or did not contribute to it ("exclusion"). *See* Def.'s Mot. Limit DNA Evid. at 2. For each sample analyzed, STRmix produced a likelihood ratio describing "how much more likely it is to obtain the DNA results if the person of interest is a contributor to the DNA profile, rather than if an unknown, unrelated person is a contributor to the DNA profile." *Id.* (citation modified). In all but one of the samples, DNA from multiple persons was detected. STRmix ultimately assigned Items 4, 44, 56(1), and 69 likelihood ratios of 10, 21, 100, and 34, respectively. *Id.* at 3. This means, for example, that the results for Item 4—for which three contributors were detected—are 10 times more likely if Mr. Joyner is one of those contributors than if he is not.

Because these numbers might not mean much to jurors, the Government proposes using a scale of verbal qualifiers to help them understand the evidentiary strength of the likelihood ratios that will be presented. The Government's proposed scale is recommended by the Scientific Working Group on DNA Methods and Analysis ("SWGDAM"), an authoritative group of forensic science practitioners who formulates consensus-based standards for forensic DNA analysis. According to the SWGDAM scale, a likelihood ratio of 1 is "uninformative," ratios between 2 and <100 provide "limited support" for inclusion, ratios between 100 and <10,000 provide "moderate support" for inclusion, ratios between 10,000 and <1,000,000 provide "strong

77

support" for inclusion, and ratios over 1,000 provide "very strong support" for inclusion. *See* Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 8.

Mr. Joyner does not dispute that STRmix "has been tested, validated, peer reviewed, and generally accepted" or that the four DNA results described above are admissible under *Daubert* and Federal Rule of Evidence 702.  Def.'s Reply in Supp. Mot. Limit DNA Evid. at 2. Nevertheless, Mr. Joyner argues that these results should be excluded under Rule 403 because their probative value—which he describes as "minimal"—is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *Id.*  Specifically, Mr. Joyner is concerned that "jurors may accord substantial weight to evidence through forensic DNA testimony simply because it bears the imprimatur of science." *Id.*; *see also Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 86 (D.D.C. 2012) ("Because expert evidence can be both powerful and quite misleading, a court has greater leeway in excluding expert testimony under Rule 403 than it does lay witness testimony." (citation modified)).

Although the Court shares Mr. Joyner's concerns, it finds that exclusion is not the proper remedy here.  For one, even if the contested DNA results are "not highly probative of inclusion"—as the Government itself suggests, *see* Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 37—the Court agrees with the Government that the results are relevant for the jury to consider.  Three of the results—Items 4, 44, and 69—had ratios under 100, so the Government proposes that its expert tell the jury that testing provided "limited support" for Mr. Joyner being one of the contributors.  The last result—Item 56(1)—had a ratio of 100, just barely providing "moderate support" for inclusion.  Even if only to a "limited" or "moderate" degree, these results tend to make it more probable that Mr. Joyner's DNA was left behind in locations and instrumentalities associated with Armed Robberies 1 and 7–10 and Armed Carjacking 1.  At the

very least, the results show that Mr. Joyner cannot be excluded as a potential contributor.[32]  *Cf.*

*United States v. Morrow*, 374 F. Supp. 2d 51, 62–66 (D.D.C. 2005) (denying motion to exclude

DNA results that "d[id] not show a significant statistical probability of inclusion" where the

results nevertheless "show[ed] that the defendants [could] not be excluded as contributors").

Furthermore, the challenged results here do not strike the Court as unfairly prejudicial for

two reasons.  First, Mr. Joyner will have the opportunity to challenge the value of the results

through cross-examination.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination . . . [is]

the traditional and appropriate means of attacking shaky but admissible evidence.").  In doing so,

Mr. Joyner could persuasively argue that the low likelihood ratios calculated for the challenged

results actually benefit him.  Other results not challenged by Mr. Joyner show likelihood ratios in

the *nonillions*.  *See* Def.'s Mot. Limit DNA Evid. at 3.  Mr. Joyner could thus argue that, by

comparison, likelihood ratios of 100 or less should be viewed with skepticism and caution.  *Cf.*

*United States v. Morrow*, 374 F. Supp. 2d 51, 65 (D.D.C. 2005) ("Indeed, the low statistical

significance actually benefits Defendants, as Defendants can argue that having [low] random

match probabilities . . . means that hundreds, if not thousands, of others in the Washington, D.C.

area cannot be excluded as possible contributors as well.").

Second, the Court believes that, with proper instructions, the jury will not overestimate

the importance of the challenged results.  The Government observes that SWGDAM prohibits

analysts from offering jurors a qualitative statement without also providing the entire scale of

verbal qualifiers.  Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 8.  SWGDAM has also

published a suggested explanation of the scale, which emphasizes that "adventitious support for a

---

[32] In contrast, results from other DNA samples that will be presented to the jury—with no objection from Mr. Joyner—do, in fact, provide limited support for *exclusion*.  *See* Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 16 & n.45.

proposition . . . is most commonly observed within the limited support category and generally not expected within the Very Strong Support category." *Id.* (citation modified). The Court thinks that this explanation is important for the jury to hear so that it understands that a likelihood ratio between 0 and 100 does not preclude the possibility of an adventitious match. Accordingly, Examiner Bakker is instructed to explain this concept to the jury. *See United States v. Gissantaner*, 990 F.3d 457, 470 (6th Cir. 2021) ("A district court concerned that the jury might misunderstand what the likelihood ratio means could require advocates to describe it in a way that will not generate unfair prejudice or mislead the jury." (citation modified)).

Mr. Joyner additionally asks that Examiner Bakker be precluded from "testifying that any likelihood ratio constitutes an absolute identification, a source attribution, or proof that Mr. Joyner's DNA was present on an evidentiary item with certainty." Def.'s Mot. Limit DNA Evid. at 1. Consistent with the guidelines set forth in the relevant DOJ ULTR, the Government represents that Examiner Bakker will not testify that any likelihood ratio provides an absolute identification or source attribution of an individual to an evidentiary sample, will not use expressions such as "reasonable scientific certainty," and will not equate a likelihood ratio with a "match." Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 16. Examiner Bakker is thus instructed to abide by the expert testimony limitations detailed in the DOJ ULTR.

Finally, Mr. Joyner seeks to exclude the CODIS Report, which details a hit between a sampled item and a robbery for which Mr. Joyner was investigated in 2017. Def.'s Mot. Limit DNA Evid. at 1. Although the Government disclosed the existence of a CODIS hit to Mr. Joyner over a year ago, it did not produce the CODIS Report until defense counsel requested it in May 2026. *See* Gov't's Opp'n to Def.'s Mot. Limit DNA Evid. at 18 n.46. Mr. Joyner thus argues that evidence of the CODIS hit was not timely disclosed and should be excluded. However,

because the Government represents that it does not intend to present this evidence at trial, *see id.*, the Court denies Mr. Joyner's request without prejudice to him renewing it if the Government decides to present this evidence.  But, again, an attempt to seek admission of this evidence this late in the proceedings will be viewed with great disfavor.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Tangible Evidence (ECF No. 52) is **DENIED**; the Government's Motion to Admit Evidence of Other Crimes (ECF Nos. 53, 98) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion for Notice of Intent to Use Rule 404(B) Evidence (ECF No. 49) is **DENIED**; Defendant's Motion *in Limine* Regarding his Criminal History (ECF No. 99) is **DENIED**; Defendant's Motion *in Limine* Regarding Propensity-Based Arguments (ECF No. 100) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion *in Limine* Regarding In-Court Identification (ECF Nos. 54, 101) is **DENIED**; Defendant's Motion *in Limine* Regarding Toolmark Identification (ECF No. 102) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion to Strike the Government's Opposition Brief (ECF No. 128) is **DENIED**; Defendant's Motion *in Limine* Regarding Law Enforcement Identification (ECF No. 103) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion *in Limine* Regarding Jail Calls (ECF No. 104) is **GRANTED**; Defendant's Motion *in Limine* Regarding Certain Photographs (ECF No. 105) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion *in Limine* Regarding the Testimony of Officer Jermone McClinton (ECF No. 106) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion for an Evidentiary Hearing (ECF No. 143) is **DENIED**; Defendant's Motion *in Limine* Regarding Certain Expert Testimony (ECF No. 107) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion *in Limine* Regarding

82

Late-Noticed Expert Testimony (ECF No. 125) is **DENIED**; Defendant's Motion *in Limine*

Regarding DNA Evidence (ECF No. 108) is **GRANTED IN PART AND DENIED IN PART**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  June 19, 2026                                          RUDOLPH CONTRERAS
                                                               United States District Judge