**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 23-309 (RC) |
| | : | |
| SHAMELL NAQUAN JOYNER, | : | Re Document No.:    162 |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**DENYING DEFENDANT'S MOTION FOR A MISTRIAL AND FURTHER RELIEF**

**I.  INTRODUCTION**

Defendant Shamell Naquan Joyner is charged in twenty-eight counts of a Superseding Indictment with Hobbs Act robbery, carjacking, transportation of a stolen vehicle, brandishing or discharge of a firearm during a crime of violence, and unlawful possession of a firearm and ammunition by a convicted felon.  *See* Superseding Indictment, ECF No. 27.  In brief, Mr. Joyner stands accused of committing ten armed robberies and two armed carjackings across the District of Columbia, Maryland, and Virginia between April and May of 2023.  A jury trial commenced in this case on June 29, 2026.  Before the Court is Mr. Joyner's motion for a mistrial and further relief based on the Government's alleged suppression of material evidence favorable to the accused.  For the reasons below, this motion is denied.

**II.  FACTUAL BACKGROUND**

On July 2, 2026—the first full day of trial testimony—the jury heard from Metropolitan Police Department Officer Michael Selgas regarding his investigation of a robbery of a Falcon Fuel gas station in Washington, D.C. on April 12, 2023, which Mr. Joyner is charged with committing.  Officer Selgas testified that shortly after the robbery, he stopped a man—"J.D."—

who fit the description of the robbery suspect.  July 2 PM Tr. at 111:5–112:16.  J.D. was quickly ruled out as the robber and released.  However, Officer Selgas mentioned on cross-examination that before J.D. was released, he had sent photos of J.D. to "another officer involved in a different offense investigation on the same day."  *Id.* at 141:14–16.  The day after he testified, Officer Selgas sent the Government the police report of this "different offense," which turned out to be an assault that occurred less than half an hour after the robbery and only a few blocks away from the Falcon Fuel.  The Government promptly shared the report with the Defense, who had been unaware of the assault.  The report states that a man named Daniel Moore was arrested for the assault.  In his present motion, Mr. Joyner argues that information relating to the assault and Mr. Moore's arrest is favorable to his defense, as it makes Mr. Moore a potential alternative perpetrator of the Falcon Fuel robbery, and that the Government's failure to timely disclose this information has therefore violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Def.'s Mot. Mistrial & Further Relief ("Def.'s Mot."), ECF No. 162.  Factual background pertinent to this motion is summarized below.

### A.  Falcon Fuel Robbery

According to the Government, on April 12, 2023, at approximately 6:00 AM, Mr. Joyner entered the Falcon Fuel gas station on 1301 13th Street, NW, and robbed it at gunpoint.  Gov't's Opp'n to Def.'s Mot. ("Gov't's Opp'n") at 2, ECF No. 165.  During the robbery, Mr. Joyner allegedly physically assaulted one of the two store clerks, discharged a gun, and then fled the scene.  *Id.*  He purportedly stole money belonging to the Falcon Fuel and personal property belonging to the two clerks.  *See* Superseding Indictment at 1–2.  Surveillance footage from the Falcon Fuel shows that the robber was a Black man who was wearing a gray-and-black hoodie with a Pittsburgh Steelers logo and a black mask covering his whole face except for his eyes.

*See* Gov't's Opp'n at 3 fig. 1.  The police report of the robbery indicates that the suspect fled on foot heading "eastbound" down a nearby alley.  *See* Def.'s Ex. A, ECF No. 162-1.

Officer Selgas, who responded to the scene of the Falcon Fuel robbery, testified that police officers canvassed for the suspect based off his path of flight.  July 2 PM Tr. at 111:12–16.  At around 7:07 AM, Officer Selgas approached an individual—"J.D."—who fit the suspect's description and stopped him so that the Falcon Fuel clerks could do a show-up identification.  Selgas BWC at 7:07:31.  Officer Selgas's body-worn camera ("BWC") footage shows J.D. to be a Black man wearing a gray sweatshirt, blue jacket, ski mask, and a multicolored backpack.  *Id.*  According to Officer Selgas, although the Falcon Fuel clerks initially identified J.D. as the robber, police ultimately released him based on inconsistencies between the clothing and physical features of the robber and J.D.  July 2 PM Tr. at 114:19–115:24.  Before J.D. was released, however, Officer Selgas shared photos of him with "another officer involved in a different offense investigation on the same day."  *Id.* at 141:14–16.  As explained below, that offense was an assault that occurred on 9th Street, NW.

### B.  9th Street Assault

Shortly after the Falcon Fuel robbery, at approximately 6:26 AM, a female victim, B.R., was physically assaulted outside her exercise studio at 1302 9th Street, NW, in Washington, D.C.  *See* Gov't's Opp'n at 3–4.  The 9th Street assault occurred a 7-min walk east of the Falcon Fuel.  *Id.* at 4 fig. 2.  According to the police report, B.R. was waiting in her car to open her studio when a man approached her and started banging on her car window.  *See* Def.'s Ex. B, ECF No.162-2.  B.R. told the man to leave, but he became irate and responded that he would kill her if she called 911.  *Id.*  B.R. got out of her car to make him stop, after which he struck her numerous times with a closed fist.  *Id.*  The assailant then fled.

3

Several police officers, including Officers Negron and Jimenez, arrived near the scene of the assault and interviewed B.R.  B.R. told the officers that she recognized the man who attacked her because he often hung out and smoked in front of her exercise studio.  *See* Jimenez BWC at 6:35:24.  She showed the officers an undated picture she had on her phone of this man.  *Id.* at 6:35:20.  According to B.R., on the morning of the assault, the man was wearing a "Bob Marley sweater" and a "darker jacket."  *Id.* at 6:35:35.  Surveillance cameras from a nearby FVC Bank captured the assault.  *See* Gov't's Opp'n at 4.  Although the footage is grainy, it shows the assailant to be a man wearing a dark jacket.  *See id.* at 6 fig. 6.

Officer Negron accompanied B.R. to the hospital.  At around 7:17 AM, he is heard on his BWC footage asking another officer over the radio about a man who had been stopped.  Negron BWC at 7:17:24.  As it turns out, this man was J.D., whom Officer Selgas had stopped as a possible suspect in the Falcon Fuel robbery.  Officer Negron asked the other officer to send him a picture of J.D. so that he could determine whether J.D. was B.R.'s assailant.  *Id.*  Officer Negron repeated his request a few minutes later.  *Id.* at 7:23:30.  At around 7:25 AM, Officer Selgas sent Officer Negron an email containing two photos of J.D.  *See* Gov't's Opp'n at 9.  J.D. was released less than a minute later.  Selgas BWC at 7:25:50.  At 7:26 AM, Officer Selgas told Officer Negron that he had sent him the photos of J.D. to his government email and noted that J.D. had only one prior arrest, for fair evasion.  *Id.* at 7:26:26.

About twelve hours after the 9th Street assault, at approximately 6:21 PM, Officer Ferguson stopped a man later identified as Daniel Moore.  *See* Gov't's Opp'n at 9–10; Gov't's Ex. 5.  BWC footage shows that when he was stopped, Mr. Moore was wearing a beige hoodie and dark jacket consistent in appearance to the jacket the assailant was depicted wearing in the FVC Bank footage.  *See* Gov't's Opp'n at 10 figs. 9–11.  B.R. was called to where Mr. Moore

4

was stopped and positively identified him as the person who assaulted her earlier that day. Gov't's Ex. 5.  Mr. Moore verbally identified himself and was placed under arrest for Assault with Significant Bodily Injury and Threats to Do Bodily Harm.  *Id.*

### III.  ANALYSIS

Mr. Joyner moves the Court for a mistrial and dismissal with prejudice of Counts 1–3 of the Superseding Indictment, which correspond to the Falcon Fuel robbery.  He argues that the Government's failure to disclose the police report for Mr. Moore's assault and arrest before trial constitutes a *Brady* violation, because the report is favorable information that is material to Mr. Joyner's defense.  *See* Def.'s Mot. at 3–7.  Additional information related to the assault remains in the Government's possession, including BWC footage from Officers Negron and Jimenez, a narrative of Mr. Moore's arrest, the docket of his criminal case, an email referencing his criminal history, and a competency determination of Mr. Moore.  The Government has declined to provide this additional information to the Defense, arguing that the 9th Street assault is "completely unrelated" to Mr. Joyner's case and that there is no evidence of a connection between the two.  Def.'s Ex. C, ECF No. 162-3.  The Government represents that this additional information is also not *Brady* material—and therefore need not be disclosed—because it is not favorable to Mr. Joyner or material to his guilt.  *See* Gov't's Opp'n at 17.  Having reviewed this information *in camera*, the Court concurs with the Government's assessment.  As set forth below, evidence of the 9th Street assault does not plausibly implicate Mr. Moore as an alternative perpetrator of the Falcon Fuel robbery.  As such, the Government is not obligated to disclose this evidence, and Mr. Joyner's requested relief is not warranted.

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

5

punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A defendant must demonstrate three elements to prove a *Brady* violation. First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Second, the "evidence must have been suppressed by the [government], either willfully or inadvertently." *Id.* at 282. Third, "prejudice must have ensued." *Id.* To satisfy the prejudice prong, the suppressed evidence must be "material." *Id.* That is, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In cases where, as here, "alternative suspect" evidence is at issue, courts have declined to find such evidence "material" for *Brady* and other similar purposes unless the defendant has shown "some plausible nexus linking the other suspect to the [charged] crime." *Toro v. Murphy*, No. CIV A 07-11721-PBS, 2009 WL 5064575, at *5 (D. Mass. Dec. 17, 2009) (quoting *Lopez v. Massachusetts*, 349 F. Supp. 2d 109, 121 (D. Mass. 2004)); *see also Kiley v. United States*, 260 F. Supp. 2d 248, 273 (D. Mass. 2003) (collecting cases) (finding that "[i]n every case that found undisclosed evidence about other suspects to be material under *Brady,* the courts found some plausible nexus linking the other suspect to the crime"). This "plausible nexus" formulation appears to be functionally identical to the standard courts apply when determining whether third-party culpability evidence is admissible under the Federal Rules of Evidence.[1]

---

[1] The Court does not mean to suggest that the evidence at issue here must be admissible for the Government to be obligated to disclose it. As Mr. Joyner notes, under Local Criminal Rule 5.1(a), the Government's requirement to disclose information constituting *Brady* material "applies regardless of whether the information would itself constitute admissible evidence." Local Crim. R. 5.1(a). Rather, whether a sufficient connection between an alternative suspect and a charged crime has been shown is relevant both to whether evidence of the alternative suspect is "material" under *Brady* and to whether it is admissible.

6

As Judge Boasberg of this Court has explained, "although defendants 'may introduce [at trial] any legal evidence tending to prove' the existence of a third-party perpetrator, consistent with a court's general license to assess the probative value of evidence proffered, the admissibility of such evidence is bounded by the requirement that it 'tend to prove or disprove a material fact' and that it not be too 'speculative or remote.'" *United States v. Moore*, 590 F. Supp. 3d 277, 281–82 (D.D.C. 2022) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006)).  The admissibility of this evidence is "determined by recourse to the general standards enumerated in Rules 401 and 403" of the Federal Rules of Evidence.  *Id.* at 282.  Although evidence of third-party guilt is often probative of a defendant's guilt or innocence under Rule 401, courts must "balance the 'probative value' of such evidence against its 'potential adverse effects'" under Rule 403, *id.* at 283 (quoting *Holmes*, 547 U.S. at 329), including its "potential to confuse the issues, mislead the jury, or generate unfair prejudice," *id.* at 283; *see also Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003) ("The potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns.").

To guard against these dangers, courts will not admit evidence of an alternative perpetrator unless the defendant proffers "evidence of a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant." *United States v. Lighty*, 616 F.3d 321, 358 (4th Cir. 2010) (citation modified).  "Although courts have not resolved the precise degree of connection required between the third party and the crime alleged, the extent of probative value of such evidence is directly tied to the 'strength of the link between the exculpatory evidence and the case at hand.'" *Moore*, 590 F. Supp. 3d at 284 (quoting *Armstrong v. Hobbs*, 698 F.3d 1063, 1066 (8th Cir. 2012)); *see also United States v. Hendricks*,

921 F.3d 320, 331 (2d Cir. 2019) (holding that a defendant has the right to admit evidence of third-party guilt "so long as the evidence 'sufficiently connect[s] the other person to the crime'" (citation modified)).

### A.  The Withheld Evidence Is Not *Brady* Material

The parties in this case do not dispute that certain evidence relating to the 9th Street assault and Mr. Moore's arrest continues to be withheld from the Defense.  Below, the Court considers whether such evidence is exculpatory or impeachment material under *Brady*, and whether it is material to Mr. Joyner's defense.

### 1.  The Withheld Evidence Is Not Exculpatory

Mr. Joyner argues that evidence of the 9th Street assault and Mr. Moore's arrest is exculpatory because there is "significant evidence of a connection" between the assault and the Falcon Fuel robbery, making Mr. Moore a potential alternative suspect in the robbery.  Def.'s Mot. at 6.  This connection, Mr. Joyner contends, is evidenced in "the close timing, proximity, direction of flight, description of the suspects, and similarities in the methods of perpetrating the alleged incidents."  *Id.*  The Court agrees with the Government, however, that the evidence does not sufficiently link Mr. Moore to the Falcon Fuel robbery.  As such, evidence relating to Mr. Moore and the assault is not material to Mr. Joyner's guilt.

The Court first addresses the alleged connection between the perpetrators of the two crimes.  Based on the Government's initial disclosure of the police report of the 9th Street assault and Mr. Moore's arrest, the Defense submitted that "[i]mmediately following the incident at Falcon Fuel, MPD Officers arrested an individual consistent with the suspect's description in the exact area that, per Officer Selgas, the Falcon Fuel suspect purportedly fled," and that this individual was arrested for the assault on B.R.  Def.'s Mot. at 3–4.  This is not accurate,

8

however.  As the Government has now clarified through additional evidence submitted to the Court, the individual detained immediately after the Falcon Fuel robbery was J.D., not Mr. Moore.  *See* Selgas BWC at 7:07:31.  J.D. was ruled out as the Falcon Fuel robbery suspect.  A different individual—Mr. Moore—was arrested hours later for the 9th Street assault.  But nothing in the evidence indicates that the officers responding to the Falcon Fuel robbery or the 9th Street assault had any appreciable reason to believe that the same individual had committed both crimes, as Mr. Joyner suggests.  *See* Def.'s Reply at 5, ECF No. 167.  Mr. Joyner makes much of the fact that Officer Negron, while responding to B.R.'s assault, requested photos of J.D., who had been stopped as a possible suspect in the Falcon Fuel robbery.  *See id.*  But Officer Negron's BWC footage shows that he inquired about J.D. after overhearing on the radio that a man had been stopped as a possible suspect in another crime—suggesting that Officer Negron simply wanted to see whether this man happened to be the same person who assaulted B.R.  *See* Negron BWC at 7:17:24.

Furthermore, there is no evidence suggesting that the officers who later arrested Mr. Moore for the 9th Street assault believed him to be connected to the Falcon Fuel robbery.  Nor is such a connection apparent to the Court.  The robbery suspect brandished a gun; Mr. Moore did not appear to have a gun on him upon arrest.  And Mr. Moore was not wearing clothes consistent with those worn by the Falcon Fuel robber.  Upon arrest, Mr. Moore was wearing a dark jacket— as was B.R.'s assailant—but the robbery suspect wore a distinctive gray-and-black Steelers hoodie and a mask.  *Compare* Gov't's Opp'n at 19 fig. 12, *with id.* at 20 fig. 13.

Mr. Joyner's attempt to discredit these points amounts to little more than a straw-man defense.  He argues that the Government's evidence cannot entirely exclude Mr. Moore as the possible robber, because Mr. Moore could have robbed the Falcon Fuel and then changed clothes

9

and hidden his gun before assaulting B.R.  *See* Def.'s Reply at 4–5.  Nor, Mr. Joyner adds, does the evidence preclude the possibility that someone other than Mr. Moore (or Mr. Joyner) could have committed both the Falcon Fuel robbery and the 9th Street assault.  *See id.*  This misses the point.  Mr. Joyner bears the burden of "proffer[ing] evidence that is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted [third party]."  *Moore*, 590 F. Supp. 3d at 283 (citation modified).  He cannot meet this burden through conjecture alone.  *See United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) ("It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime.").  Independent of whether Mr. Moore or another third party *could have* committed both the Falcon Fuel robbery and the 9th Street assault, Mr. Joyner proffers no evidence showing an affirmative link between any particular third party and the Falcon Fuel robbery.

Finally, the circumstances surrounding the commission of the Falcon Fuel robbery and the 9th Street assault are not so similar as to suggest more than a speculative connection between the perpetrator(s) of the two crimes.  As the Government notes, the Falcon Fuel robber "entered the store with a mask and a gun, held up two strangers, physically assaulted a clerk to get money, shot the gun he was carrying at the clerks, stole their wallets and phones, and then fled."  Gov't's Opp'n at 18 (citation modified).  In contrast, the perpetrator of the 9th Street assault punched a woman who knew him and did not appear to have a gun.  Mr. Joyner stresses that the Falcon Fuel robber fled in the direction of the location of the 9th Street assault just minutes before the assault.  *See* Def.'s Reply at 2–3.  This is true.  But the Court does not believe that physical and temporal proximity alone—without other evidence showing, for example, the assailant's motive or opportunity to rob the Falcon Fuel—can plausibly link the 9th Street assault and the Falcon

10

Fuel robbery. *Cf. Bradley v. Burge*, No. 06 CIV. 0040 (JGK), 2007 WL 1225550, at *6 (S.D.N.Y. Apr. 19, 2007) ("The fact that there were other rapes in the area and that another person was arrested for those rapes does not suggest beyond speculation that the other person committed the rapes at issue in this case.").

2. The Withheld Evidence Is Not Impeachment Material

Even if the withheld evidence is not exculpatory, Mr. Joyner argues that it is impeachment material subject to disclosure. *See* Def.'s Mot. at 5. Again, the Court disagrees. Impeachment evidence is material if "the undisclosed information could . . . substantially affect[ ] the efforts of defense counsel to impeach [a] witness, thereby calling into question the fairness of the ultimate verdict." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996); *see also Bagley*, 473 U.S. at 675 ("[T]he prosecutor is . . . required . . . only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."). Mr. Joyner argues that evidence of the 9th Street robbery and Mr. Moore's assault could have served to impeach Officer Selgas about "the steps taken to investigate the incident and rule out other individuals who may have committed the Falcon Fuel robbery." Def.'s Mot. at 5. However, the impeachment value of such evidence is undermined by Mr. Joyner's failure to demonstrate any plausible connection between the Falcon Fuel robbery and the 9th Street assault. The Defense had the opportunity to cross-examine Officer Selgas regarding the police's investigation and exclusion of J.D. as a possible suspect in the robbery. *See* July 2 PM Tr. at 141:10–143:11. True, the Defense did so without knowing about the 9th Street assault or that J.D. had also been considered a possible suspect in that assault. *See* Def.'s Reply at 7. But the Court does not see how knowledge of these facts could have materially affected the Defense's impeachment efforts, given the lack of a nexus between the assault and the robbery.

**B. Mr. Joyner's Requested Relief Is Not Warranted**

Because information relating to the 9th Street assault and Mr. Moore's arrest is neither exculpatory nor impeachment material, the Government has not violated *Brady* by failing to disclose these facts before trial or by continuing to withhold related information. Accordingly, the Court denies Mr. Joyner's request for a mistrial and dismissal with prejudice with respect to Counts 1–3 of the Superseding Indictment.[2] For the same reason, the Court denies his request for the Court to compel production of "all related materials in the prosecution team's possession . . . relating to the arrest and detention of the potential alternative suspect on April 12, 2023," as well as his requests for an "opportunity to recall and conduct expanded re-cross-examination of each of the three witnesses who previously testified regarding the [Falcon Fuel] robbery," for an adverse inference jury instruction, and for leave to call additional witnesses or offer additional evidence relating to the withheld evidence. Def.'s Reply at 9–10. Nevertheless, Mr. Joyner retains the right to present his case through the witnesses he chooses.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion for a mistrial and further relief (ECF No. 162) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 13, 2026                                RUDOLPH CONTRERAS
                                                     United States District Judge

---

[2] Mr. Joyner initially also requested a mistrial and further relief with respect to Counts 9 and 10—which charge Mr. Joyner with robbing a 7-Eleven in Alexandria, Virginia on April 17, 2023—based on the Government's ballistic evidence showing a link between the Falcon Fuel robbery and the 7-Eleven robbery. *See* Def.'s Mot. at 8. However, the Government has now produced evidence showing that Mr. Moore could not have robbed the 7-Eleven because he was detained on the day of that robbery—which also makes it less likely that he robbed the Falcon Fuel. Gov't's Opp'n at 25. In any event, Mr. Joyner has now withdrawn his request for a mistrial and further relief with respect to Counts 9 and 10. *See* Def.'s Reply at 9.